Earl J. SMITH, Plaintiff-Appellee,

v.

INDUSTRIAL EMPLOYERS AND DISTRIBUTORS ASSOCIATION, and Bird and Son of Massachusetts, Inc., Defendants-Appellants.

Nos. 75-1327 and 75-1333.

United States Court of Appeals, Ninth Circuit.

Nov. 23, 1976.

As Amended Jan. 26, 1977.

Rehearing and Rehearing En Banc Denied Feb. 2, 1977.

with prospective witnesses or with the accused.

Donald D. Connors, Jr. (argued), Brobeck, Phleger & Harrison, San Francisco, Cal., for defendant-appellant in 75–1327.

James L. Hunt (argued), McCutchen, Doyle & Brown & Enerson, San Francisco, Cal., for defendant-appellant in 75–1333.

John K. Villa, Atty. (argued), App. Section, Civ. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before DUNIWAY and GOODWIN, Circuit Judges, and LUCAS,* District Judge.

DUNIWAY, Circuit Judge:

Industrial Employers and Distributors Association (IEDA) and Bird and Son, defendants below, appeal from a summary judgment in favor of Smith, plaintiff below. The district court held pensions to be "perquisites of seniority" under 38 U.S.C. § 2021(b)(1), formerly 50 U.S.C. App. § 459(b)(B)(i), and permitted Smith, a veteran, to include the time he spent in the Armed Services in computing the amount of his pension. While our analysis differs from that of the district court, we agree with its conclusion and affirm.

## I. FACTS.

Smith began working for Pabco Products in March, 1930. He worked without interruption until his induction into the United States Army in December of 1942. In October, 1945, Smith received an honorable discharge and asked Pabco to reemploy him. A strike delayed his reinstatement until March of 1946. Except for three months during two strikes Smith was continuously employed by Pabco—or by Bird, which acquired Pabco in 1968—until his retirement at the end of 1970, when he became eligible to draw pension benefits.

The pension plan at issue here was established in June, 1956, by a Collective Bargaining Agreement between the International Longshoremen's and Warehousemen's Union and the Distributors Association of Northern California, of which Pabco was and Bird is a member.[1] Although certain provisions have been modified to provide greater benefits to recipients, the plan's contours remain basically unchanged.

*Benefits* :

The size of an employee's monthly pension is calculated by multiplying a monetary coefficient determined by the Union and IEDA (currently $8.25) by the number of years of credited service. This latter factor contains two different components, future service and past service. In calculating benefits the plan counts units of past and future service equally. However, the provisions governing accumulation are quite different.

*Future Service* :

An employee received ¹⁄₁₂th of a future service credit in any month commencing after May 31, 1956, if:

* The Honorable Malcolm M. Lucas, United States District Judge for the Central District of California, sitting by designation.

---

1. The Union designated defendant IEDA to administer the plan.

(1) he is employed on the 20th of that month by a covered employer (a signatory to the pension agreement);

(2) he has been employed continuously for 30 calendar days preceding the 20th; and

(3) his employer has made his monthly contribution to the pension fund in an amount determined by the Collective Bargaining Agreement.

### Past Service:

The plan also grants past service (pre-plan) credit for work performed within 35[2] years of the date on which the employee retires if:

(1) he was over 30[3] when he performed the work;

(2) he was eligible for a vacation[4] during the corresponding calendar year; and

(3) the establishment in which the past service was performed became covered by the pension plan no later than December 31, 1956.

The plan specifically denies credit, past or future, for time spent in the military.

2. The number was 25 before 1970.

3. The age cutoff was 40 before 1970.

4. It is unclear whether 1,500 or 1,730 hours of work were required for eligibility for a vacation during the years (1942–45) in question. It is undisputed that the work requirement was substantial.

5. This includes the entire 174-month period commencing June 1, 1956, and ending November 30, 1970, the month in which Smith turned 65, except for three months in 1959 and 1967 when the Union was on strike.

6. The pertinent language of the 1940 statute is: "(b) In the case of any such person who, in order to perform such training and service, has left or leaves a position, . . . in the employ of any employer and who . . . (2) is still qualified to perform the duties of such position, and (3) makes application for reemployment within forty days after he is relieved from such training and service—

\* \* \* \* \* \*

### Financing:

The plan is totally funded by employer contributions. An employer is liable for an amount established in the Collective Bargaining Agreement for each month of future credited service accumulated by a covered employee (currently $77.85). He bears no responsibility for extinguishing the liability created by unfunded past service credit.

When Earl Smith retired at the end of 1970, he received 14³/₁₂ units of future service credit,[5] an amount that he concedes is correct, and 17⁶/₁₂ units of past service credit. This figure represents only the time when he was on Pabco's payroll, from November, 1935 (when he turned 30), until June of 1956, and excludes the 34 months that he spent in the Armed Services. The problem we face is whether § 8(b) of the Selective Service and Training Act of 1940, 54 Stat. 885, 890, now codified at 38 U.S.C. § 2021, requires the inclusion of those 34 months in Smith's past credited service.

### II. DECISIONAL FRAMEWORK.

The statute with which we deal, as noted above, was enacted in 1940.[6] At that time Congress was concerned principally with

(B) if such person was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so;

\* \* \* \* \* \*

(c) Any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) shall be considered as having been on furlough or leave of absence during his period of training and service in the land or naval forces, shall be so restored without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, . . .."

54 Stat. 890.

the growing danger of world war, and not with the distant problems of demobilization. Section 8 was, in the words of a contemporary commentator, an afterthought. *See* Comment, *Veterans' Reemployment Rights Under Selective Service Interpretations,* 54 Yale L.J. 417, 418–19 n.8 (1945). It is not surprising that the statute is ambiguous, guaranteeing returning veterans against any loss of seniority without defining what seniority is. At least two sensible interpretations are possible. Congress may have intended to restore the veteran to the same relative seniority that he held before induction vis-a-vis fellow employees who did not serve in the Armed Forces, implicitly counting time in uniform as time on the job. On the other hand, the language might as easily be read as protecting only against the forfeiture of absolute seniority accumulated before induction. *See* Haggard, *Veterans' Reemployment Rights and the "Escalator Principle",* 51 B.U.L.Rev. 539, 541–44 (1971).

The Supreme Court first faced this problem in *Fishgold v. Sullivan Drydock & Repair Corp.,* 1946, 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230, where Mr. Justice Douglas chose the first alternative:

> [The veteran] does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war. 328 U.S. at 284–85, 66 S.Ct. at 1111.

However, in answering one question, the Court created a second: What is seniority? In *Accardi v. Pennsylvania R.R. Co.,* 1966, 383 U.S. 225, 86 S.Ct. 768, 15 L.Ed. 717, Mr. Justice Black attempted this explanation:

> The term "seniority" is not to be limited by a narrow, technical definition but must be given a meaning that is consonant with the intention of Congress as expressed in the 1940 Act. That intention was to preserve for the returning veterans the rights and benefits which would have automatically accrued to them had they remained in private employment rather than responding to the call of their country. 383 U.S. at 229–30, 86 S.Ct. at 771.

In general, then, we may define seniority benefits as those which reward longevity, not those which compensate for work actually performed. *See also Foster v. Dravo Corp.,* 1975, 420 U.S. 92, 97, 95 S.Ct. 879, 43 L.Ed.2d 44; *Austin v. Sears, Roebuck & Co.,* 9 Cir., 1975, 504 F.2d 1033, 1035.

However, even the best definition is not a solution. It may be obvious that a physician who leaves an internship to serve in the Armed Forces is not entitled to return as head resident, but most of the problems which courts have confronted are not as easily solved. *Cf. Earls v. Atchison, Topeka and Santa Fe Ry.,* 9 Cir., 1976, 532 F.2d 133. The statute assumes that there exists a distinct line between rewards for status and compensation for work. In reality many benefits combine the two; they recompense employees for both status and work. These hybrids are out of place in a system which recognizes only purebreds. Hence, we must "unmix" the benefit in a way never foreseen by the contracting parties or the Congress, to determine which characteristics trace their lineage to seniority. *Accardi, supra,* 383 U.S. 229–31, 86 S.Ct. 768; Haggard, *Veterans' Reemployment Rights and the "Escalator Principle",* 51 B.U.L.Rev. at 577.

### III. ANALYSIS.

The defendant argues persuasively that pensions generally are a form of deferred compensation, and not "perquisites of seniority" protected by the Act. *See Inland Steel Co. v. NLRB,* 7 Cir., 1948, 170 F.2d 247, 251–55, *cert. denied in part,* 1949, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 *affirmed on other grounds sub nom., American Communications Assn. v. Douds,* 1950, 339 U.S. 382, 70 S.Ct. 674, 94 L.Ed. 925. The plaintiffs and the district court disagree, conceptualizing pension benefits as what an employee received in exchange for surrendering his "job and its concomitant seniority rights." 385 F.Supp. 1281, 1286. Both arguments miss the point, and place undue emphasis on the parties' imprecise "labels and definitions" to define "rights guaranteed by the Act." *Accardi, supra,*

383 U.S. 229, 86 S.Ct. 768; *Litwicki v. Pittsburgh Plate Glass Industries,* 3 Cir., 1974, 505 F.2d 189, 192.

The general function of pension benefits in late-20th century America is not in issue. We are concerned solely with analyzing the benefits provided by the specific plan that is before us. *See Palmarozzo v. Coca-Cola Bottling Co.,* 2 Cir., 1973, 490 F.2d 586, 595–96 n.2 (Friendly, J., dissenting), *cert. denied,* 1974, 417 U.S. 955, 94 S.Ct. 3083, 41 L.Ed.2d 673. Applying this method of the case before us, the way in which we must diagnose the pension plan is clear. The plan rests upon two types of service—future and past—and it is essential to analyze each separately.

Future service is work performed after June 1, 1956, the date the pension plan was inaugurated. Beginning with that date, an employee could logically consider his salary to be composed of two parts—present payment (wages) and future rights (pension). Unquestionably, both represent consideration for which the union bargained, and consideration for which the employee works. Had Smith served in the Armed Forces after June, 1956, 38 U.S.C. § 2021 would entitle him neither to pension credits nor wages for the period spent in uniform.[7] *See Foster v. Dravo Corp., supra; Austin v. Sears, Roebuck & Co., supra.*

The true nature of pension benefits based on past credited service is more difficult to discover. As a first approximation, it is probably correct to label them compensation. Payments, direct or indirect, from employers to employees are normally not considered gifts. *Cf. Commissioner of Internal Revenue v. Duberstein,* 1960, 363 U.S. 278, 287, 80 S.Ct. 1190, 4 L.Ed.2d 1218. However, the question is not whether it was compensation, but what it was compensation for.[8]

IEDA argues that past service credits are payments for past service rendered. Semantically, this approach is attractive, but it requires analysis which we undertake in this example: Consider employee X who in 1943, 1944, and 1945 agrees not to withhold his services. He does so because his employer has offered him an ample package of rights that we may label his salary. Let us assume that each party fulfills his bargain and continues this arrangement until 1956. In that year X asks for a salary increase, which his employer believes is too large. X has only one way in which to press his demands—by withholding his labor from that day forward. He cannot undo work he has already performed. If the employer capitulates, he does so only to obtain future services. That the employment contract states that the employer is granting X an increase equal to $100 for each of the prior fifteen years of service does not transform the $1,500 to income earned in 1941–55. The money is earned in 1956. A past service factor appears in the salary equation, but as a constant, unchanging and unchangeable.

■ The situation here is analogous to that posed in the hypothetical, except that the payments do not flow directly from employer to employee. The amount of the payments—as well as the whole scheme—was not established until 1956, when the pension plan was established. Thus enhancement of the employee's future entitlement by reason of pre-1956 employment is not pay for that employment. It is a product of length of service, and hence, for the purpose of computing it, time spent in military service must be included. Otherwise, Smith will not have "step[ped] back on [the escalator] at the precise point he would have occupied had he kept his position continuously during the war." (*Fishgold, supra.*) That past services credits are com-

---

**7.** This was precisely the factual situation which faced the Third Circuit in *Litwicki, supra.* It is not clear whether it is also identical to the problem resolved by the Tenth Circuit in *Jackson v. Beech Aircraft Corp.,* 10 Cir., 1975, 517 F.2d 1322. In any event we perceive no explicit conflict between this opinion and *Jackson.*

**8.** As Winston Churchill is said to have remarked, the prohibition against ending a sentence with a preposition is "arrant pedantry up with which I will not put."

puted with reference to actual service does not alter our conclusion. In substance they are a benefit which "necessarily [has] accrued by virtue of continued employment [and which can] not be denied the veteran merely because of his absence in military service." *Foster v. Dravo Corp., supra,* 420 U.S. at 97, 95 S.Ct. at 883. *Accord* U. S. Dept. of Labor, *Veterans' Reemployment Rights Handbook* 97 (1970). Pre-plan service credits reward longevity, not actual work on the job, and must be classified as perquisites of seniority. *See Austin v. Sears, Roebuck & Co., supra,* 504 F.2d at 1035.

The judgment of the district court is affirmed.