# COFFY *v.* REPUBLIC STEEL CORP.

No. 79–81.  Argued February 27, 1980—Decided June 10, 1980

MARSHALL, J., delivered the opinion for a unanimous Court.

*Alan I. Horowitz* argued the cause *pro hac vice* for petitioner. With him on the brief were *Solicitor General McCree, Beate Bloch,* and *William H. Berger.*

*Michael A. Nims* argued the cause for respondent. With him on the brief was *Victor E. DeMarco.*

Mr. Justice Marshall delivered the opinion of the Court.

The Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U. S. C. § 2021 *et seq.*, provides that any person who leaves a permanent job to enter the military, satisfactorily completes military service, and applies for re-employment within 90 days of being discharged from the military must be reinstated to the former job without loss of seniority. This case presents the question whether supplemental unemployment benefits provided pursuant to the steel industry collective-bargaining agreement are perquisites of seniority to which a returning veteran is entitled under the statute.

I

Petitioner Thomas Coffy was employed by respondent Republic Steel Corp. (Republic) from April 30, 1968, until September 17, 1968, and again from January 24, 1969, until September 9, 1969, when he entered military service. He served in the military until he was honorably discharged on August 16, 1971. He made timely application for reinstatement on September 14, 1971. Because Republic was then in the process of laying off employees and Coffy would already have been laid off if he had remained continuously employed during his period of military service, he was reinstated in layoff status. Coffy was recalled to work on July 1, 1972.

While Coffy was laid off, he received weekly payments under the supplemental unemployment benefits (SUB) plan created by the collective-bargaining agreement between the major steel companies, including Republic, and the United Steelworkers of America (Steelworkers). Coffy received SUB payments for 25 weeks.[1] If he had been employed by Republic during his period of military service, he would have been

---

[1] Republic erroneously credited Coffy with approximately nine SUB credits for his 1968 employment. The plan provides that accumulated SUB credits are canceled if an employee quits work voluntarily, as petitioner did after his layoff in 1968. The overpayment was recovered through deductions from petitioner's paycheck after he returned to work.

entitled to 52 weeks of SUB payments. Coffy, represented by the Department of Justice pursuant to 38 U. S. C. § 2022, filed this action in the United States District Court for the Northern District of Ohio, alleging that Republic violated his statutory re-employment rights by refusing to consider his military service time in computing the amount of SUB payments to which he was entitled.[2]

The District Court, relying on *Foster* v. *Dravo Corp.*, 420 U. S. 92 (1975), entered judgment for respondent. The court held that the plan was "a bona fide effort to relate qualification for weekly benefits . . . to work actually performed," App. to Pet. for Cert. 24a, and therefore the benefits were not a perquisite of seniority. While the case was pending on petitioner's appeal to the United States Court of Appeals for the Sixth Circuit, we held in *Alabama Power Co.* v. *Davis*, 431 U. S. 581 (1977), that pension benefits are perquisites of seniority protected under the statute. The Court of Appeals *sua sponte* vacated the District Court's judgment and remanded for reconsideration in light of *Alabama Power.*

On remand, the District Court adhered to its decision that SUB credits are not seniority rights entitled to statutory protection. 461 F. Supp. 344 (1978). The Court of Appeals affirmed on the opinion of the District Court. 590 F. 2d 334 (1978). We granted certiorari, 444 U. S. 924 (1979), to resolve a conflict among the Circuits concerning this important question in the interpretation of the statute.[3] We now reverse.

---

[2] The complaint alleged a violation of § 9 of the Military Selective Service Act of 1967, 50 U. S. C. App. § 459 (1970 ed.). The provisions of that statute relating to veterans' re-employment rights were re-enacted without substantive change in Title IV of the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U. S. C. § 2021 *et seq.*

[3] The Third and Seventh Circuits have held that SUB payments are perquisites of seniority to which a returning veteran is entitled under the Act. *Hoffman* v. *Bethlehem Steel Corp.*, 477 F. 2d 860 (CA3 1973); *Akers* v. *General Motors Corp.*, 501 F. 2d 1042 (CA7 1974). Approximately

## II

The Vietnam Era Veterans' Readjustment Assistance Act of 1974 (Act), 38 U. S. C. § 2021 *et seq.,* requires that returning veterans be reinstated to the jobs they left for military service "or to a position of like seniority, status, and pay." § 2021 (a)(B)(i).[4]  The Act further provides that the veteran

---

1,947,400 workers are covered by collective-bargaining agreements that provide supplemental unemployment benefits. See U. S. Dept. of Labor, Bureau of Labor Statistics, Bull. No. 2065, Characteristics of Major Collective Bargaining Agreements 101 (1980).

[4] Title 38 U. S. C. § 2021 provides in relevant part:

"(a) In the case of any person who is inducted into the Armed Forces of the United States . . . and who leaves a position (other than a temporary position) in the employ of any employer in order to perform such training and service, and (1) receives a certificate described in section 9 (a) of the Military Selective Service Act (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service . . . —

"(B) if such position was in the employ of a . . . private employer, such person shall—

"(i) if still qualified to perform the duties of such position, be restored by such employer . . . to such position or to a position of like seniority, status, and pay[,]

"unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so. . . .

"(b)(1) Any person who is restored to or employed in a position in accordance with the provisions of . . . this section shall be considered as having been on furlough or leave of absence during such person's period of training and service in the Armed Forces, shall be so restored or reemployed without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration or reemployment.

"(2) It is hereby declared to be the sense of the Congress that any person who is restored to or employed in a position in accordance with . . .

be reinstated "without loss of seniority." § 2021 (b)(1). We interpreted the predecessor of § 2021 [5] to mean that the returning veteran "does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during the war." *Fishgold* v. *Sullivan Drydock & Repair Corp.*, 328 U. S. 275, 284–285 (1946). Congress incorporated this principle into the present statute by providing that any person reinstated under the Act should be given "such status in the person's employment as the person would have enjoyed if such person had continued in such employment continuously" during the period of military service. § 2021 (b)(2). The statute is to be liberally construed for the benefit of the returning veteran. *Fishgold* v. *Sullivan Drydock & Repair Corp.*, *supra*, at 285.

We have several times had occasion to consider whether a particular type of benefit is a perquisite of seniority. *Accardi* v. *Pennsylvania R. Co.*, 383 U. S. 225 (1966), involved a claim for severance pay. The amount of the payment depended on the employee's length of "compensated service." *Id.*, at 228. We rejected the employer's argument that the payment was not based on seniority, but on total service to the company. Rather, we held, the "real nature" of the payments was compensation for the loss of the job. *Id.*, at 230. Because "the cost to an employee of losing his job is not measured by how much work he did in the past . . . but by the rights and benefits he forfeits by giving up his job"—rights and benefits that

---

this section should be so restored or reemployed in such manner as to give such person such status in the person's employment as the person would have enjoyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment."

[5] The Selective Training and Service Act of 1940, ch. 720, § 8 (b), 54 Stat. 890, later re-enacted as the Military Selective Service Act of 1967, 50 U. S. C. App. § 459 (1970 ed.), and subsequently re-enacted as 38 U. S. C. § 2021 *et seq.* See n. 2, *supra.*

are largely determined by seniority—the severance payment was "just as much a perquisite of seniority as the more traditional benefits such as work preference and order of lay-off and recall." *Ibid.*

We reached a different result in evaluating a claim for vacation benefits in *Foster* v. *Dravo Corp.*, 420 U. S. 92 (1975). The real nature of that benefit, we observed, was reflected in "the common conception of a vacation as a reward for and respite from a lengthy period of labor," *id.*, at 101. The contractual provisions for additional vacation credits and higher benefits for overtime work and for pro rata vacations for employees laid off before achieving the necessary number of weeks worked supported that conception. Accordingly, we held that vacation pay was intended as a form of deferred short-term compensation for work actually performed and was not, therefore, a seniority right protected by the statute.

Most recently, in *Alabama Power Co.* v. *Davis*, 431 U. S. 581 (1977), we held that pension benefits were perquisites of seniority for purposes of the Act. Although the amount of the payment was directly dependent on the years of accredited service, the true nature of the benefits was "a reward for length of service," *id.*, at 593. The lengthy period required for vesting, the use of payment formulas based on earnings at the time of retirement, and "the function of pension plans in the employment system"—namely, to provide financial security to employees, assure a stable work force, and increase efficiency—all led to the conclusion that pension payments "are predominantly rewards for continuous employment with the same employer." *Id.*, at 594. In *Alabama Power*, we summarized the principles that have emerged from the cases and concluded that they establish a two-pronged test for determining whether a benefit is a perquisite of seniority under the Act. First, there must be a reasonable certainty that the benefit would have accrued if the employee had not gone into the military service. *Id.*, at 589. Second, the nature of the benefit must be "a reward for length of service," rather

than a form of "short-term compensation for services rendered." *Ibid.*

Our task, then, is to evaluate the SUB plan at issue in this case in light of these principles.

## III

### A

The first SUB plan for the steel industry was established through collective bargaining in 1956. The revised plan which is the subject of this action became effective January 1, 1969. The plan provides three types of benefits: a "weekly benefit," a "short week benefit," [6] and a relocation allowance. Petitioner's claim involves weekly benefits, which are provided to employees laid off from work as a supplement to unemployment compensation benefits provided under state law. The amount of an employee's weekly SUB payment is determined by his hourly wage rate, the number of his dependents, the amount of state unemployment compensation he is receiving, and the level of funding remaining in the plan. The length of time during which the employee receives SUB payments is determined by the number of credit units he has accumulated before being laid off.

Section 2.0 of the plan provides that an employee accrues one-half credit for each week in which he worked any hours, or was paid for any hours not worked (such as for vacation or jury duty), or lost any hours because he was performing certain union duties or was on disability leave. [7] A maximum of 52 credit units may be accrued by an employee at any one time. An employee is entitled to receive SUB payments only if he has completed two years of continuous service prior to

---

[6] An employee having two years of continuous service is eligible for a "short week benefit" for any week in which some, but fewer than 32, hours are worked.

[7] Certain categories of employees accrue and exhaust credits at a slightly different rate, see §§ 2.1 and 4.10 of the plan, App. 20, 27, but that distinction is not significant for purposes of this analysis.

being laid off. An employee who meets this threshold requirement may receive one week of supplemental unemployment benefits for each credit unit he has accumulated.

The plan also provides, in § 7.2:

> "If an employee enters the armed services directly from the employment of the Company, he shall, while in service, be deemed for the purposes of the Plan to be on leave of absence and shall not be entitled to any Benefit. Only the credit units credited to him at the time of his entry into such service shall be credited to him upon his reinstatement as an employee of the Company with unbroken continuous service, except as may otherwise be required by law."

Under this provision Republic declined to credit petitioner for his military service time in calculating the number of SUB payments to which he was entitled.[8] We must determine whether the provision is in conflict with the Act.

### B

The SUB plan satisfies the reasonable-certainty prong of the *Alabama Power* test, since if Coffy had remained continuously employed by Republic instead of entering the military, he would have accumulated credits from the date he was hired until the date he was laid off. We conclude that the plan also satisfies the second prong of the test, because supplemental unemployment benefits are not a form of deferred short-term compensation, but are a reward for length of service closely analogous to traditional forms of seniority.

---

[8] Coffy received credit for his time in the military in computing his period of continuous service to determine his eligibility to receive benefits. We find no inconsistency in the company's action in counting his military service time toward eligibility to receive benefits, but not toward the number of credits he had accumulated. The plain intent of § 7.2 is that during their period of military service, employees shall neither receive benefits nor accrue credits, but that military service shall not be considered a break in continuous service.

The concept of supplemental unemployment benefits evolved from the demand by organized labor for a guaranteed annual wage. When it became evident that a guaranteed annual wage was impractical in their industries, unions such as the Steelworkers and the United Auto Workers transformed their guaranteed annual wage demands into proposals to supplement existing unemployment compensation programs. These proposals ultimately were adopted in several industries in the form of SUB plans. See J. Becker, Guaranteed Income for the Unemployed: The Story of SUB 9–20 (1968); A. Freedman, Security Bargains Reconsidered: SUB, Severance Pay, Guaranteed Work 4–5 (The Conference Board 1978). From the beginning, then, the purpose of SUB plans was to provide employment security regardless of the hours worked rather than to afford additional compensation for work actually performed. From the employer's standpoint SUB's, like pension benefits, help to assure a stable work force through periods of short-term layoffs and, like severance payments, may increase management flexibility in implementing technological advances. See Becker, *supra,* at 55–57, 248.

The essential function of SUB plans is to provide economic security for regular employees in the event they are laid off. Protection against layoff is, of course, one of the traditional attributes of seniority. SUB payments provide a second-level protection against layoff. If an employee does not have sufficient seniority to avoid being laid off, he may still have achieved the minimum level of seniority necessary to receive SUB payments during his layoff. Unlike vacations, SUB's cannot be compensation for work performed, a "reward for and respite from a lengthy period of labor," *Foster* v. *Dravo Corp.,* 420 U. S., at 101, for they are contingent on the employee's being thrown out of work; unless the employee is laid off he will never receive SUB payments. In this sense, SUB's are analogous to severance payments: they are "compensation for loss of jobs." *Accardi,* 383 U. S., at 230. See Freedman, *supra,* at 2.

We turn now to the specific provisions of the steel industry SUB plan to determine whether they support or contradict our understanding of the general purpose of SUB programs. The District Court held that the availability of SUB payments was so closely related to hours actually worked as to demonstrate that the plan was a " 'bona fide effort to compensate for work actually performed.' " 461 F. Supp., at 346. That conclusion is at odds with the literal terms of the plan, which provide that SUB credits are earned for all weeks in which an employee has *any* hours in one of the three categories specified in § 2.0. This provision was the result of a 1962 modification of the original 1956 plan, which had directly correlated hours worked with credits earned by providing that $\frac{1}{10}$ credit would be earned for every eight hours worked, up to a maximum of $\frac{1}{2}$ unit per week. The District Court recognized that the present plan did not expressly relate entitlement to benefits to hours worked, but found this fact to be of no significance because " '[c]ircumstances existing in the steel industry, as revealed by the uncontradicted evidence in this case, demonstrate that, in practice, the minimum workweek is 32 hours. . . . The plan must be construed in light of actual conditions in the steel industry. The possibility of an employee working only one hour during any week does not exist.' " *Id.*, at 347.[9]

---

[9] The District Court's view that the benefits were intended to be correlated to work actually performed is supported by the testimony of James Carney, an attorney for United States Steel Corp. He stated that the reason for the 1962 change was that there was no need to keep track of the actual hours worked since it was rare for anyone to work fewer than 32 hours a week. This testimony was contradicted, to some extent, by that of Joseph Senturia, a consultant to the Steelworkers. He testified that the change was adopted to liberalize the accrual of credit units and as part of a general simplification of SUB plans in use in the steel industry. In fact, by 1962 SUB plans in all industries provided for accumulation of credit in any week in which any work was performed or any pay received. See J. Becker, Guaranteed Income for the Unemployed: The Story of SUB 125 (1968).

We of course accept the District Court's factual findings concerning the practice in the industry. We do not agree, however, that a *de facto* 32-hour minimum workweek means that SUB's are intended as deferred compensation for work performed. Credits are also earned for weeks in which the employee is paid for any hours not worked, as for jury duty, or in which any hours are lost because the employee is disabled or performing certain union duties. These hours, even if considered similar to hours worked because the employee receives "wage substitutes" for them, are not subject to the 32-hour industry custom.

We observe also that the normal workweek in the industry, as provided by Art. 6, § 1, of the collective-bargaining agreement, is 40 hours, not 32. The SUB plan makes no provision for accrual of additional credits for hours worked over 32 per week, or for overtime work. This omission is not suggestive of a desire to compensate work actually performed.

Further, a major reason that it is rare for an employee who works at all to work fewer than 32 hours in a week is the "short week benefit" provided under the SUB plan.[10] Quali-

---

[10] Employees having two years of continuous service are eligible for a "short week benefit" for any week in which they work some, but fewer than 32, hours. Roughly speaking, the employee is paid at his regular hourly rate for the difference between 32 hours and the number of hours worked. The amount of the benefit is computed by taking the amount by which 32 hours exceeds the sum of the hours worked, paid, not worked for reasons other than lack of work, lost because of labor problems involving the company or transportation or utility companies, or not worked because the employee quit or was suspended or discharged, and multiplying that number by the employee's regular hourly wage rate. One-half credit unit is canceled for every week in which the employee receives short-week benefits. Since the employee also receives one-half credit because he worked some hours in the week, the net effect is that his accumulated credits remain the same.

The other reasons for the 32-hour custom which were cited in the testimony included the nature of steel manufacturing operations, which must

fied employees who work some hours, but fewer than 32, receive benefits under the short-week provisions of the plan; those who do not work at all receive weekly benefits. The union's success in effectively achieving a guaranteed 32-hour week through the mechanism of the short-week benefit does not logically alter the nature of the weekly benefit negotiated as part of the same plan.

Even if eligibility for SUB payments were closely related to hours worked, that fact would not, by itself, render them compensation rather than seniority rights. We emphasized in *Alabama Power* that it is the nature of the benefit, not the formula by which it is calculated, that is the crucial factor, for "[e]ven the most traditional kinds of seniority privileges could be as easily tied to a work requirement as to the more usual criterion of time as an employee." 431 U. S., at 592. As we have explained, the specific provisions of the steel industry plan support, rather than contradict, our conclusion that SUB payments are in the nature of a reward for length of service.

The District Court concluded that SUB payments could not be perquisites of seniority for the further reason that the benefits are not proportionate to the length of service. Under the plan, an employee must have a minimum of two years' seniority to be eligible for SUB payments, no employee may accumulate more than 52 units of SUB credits, and the amount of the benefit does not increase with the length of service as would a pension benefit. Thus an employee who has worked continuously for two years will have met the threshold requirement and will also have accumulated 52 units

---

be conducted on a 24-hour basis; Art. 6, § 6, of the collective-bargaining agreement, which provides that any employee who reports for work must be given at least 4 hours' work; and Art. 10, § 7, of the agreement, which requires management to consult with the union on the distribution of work if a decrease in the amount of work available results in an average work-week of 32 hours or fewer.

of credit;[11] he is eligible for benefits for the same length of time, and computed according to the same formula, as an employee with 20 years' seniority.[12]   According to the District Court, the facts that no benefits are available to employees whose seniority is less than two years and that after 52 credits have been accumulated additional seniority does not lead to increased benefits were evidence that the benefit is not a reward for longevity of service.[13]

---

[11] The 2-year continuous service requirement and the 52-credit maximum accumulation are not coextensive.   For example, an employee who is laid off before he has been with the company for two years continues to compute his period of continuous service from his original hire date, but does not accumulate credit units during the time he is laid off.   Similarly, § 2.4 of the plan permits the employer to cancel the credit units of an employee who willfully falsifies or withholds information on which his weekly benefit is based; such cancellation would not affect the length of the employee's continuous service.

[12] Of course, since a more senior employee's wage rate is likely to reflect his longer service with the company, a senior employee often will receive a higher SUB payment than will a junior employee.

Modifications to the steel industry SUB program adopted in 1977 have increased the differentiation between less senior employees and those with greater seniority.   Benefit payments for employees with 20 or more years of service will no longer be reduced because of the financial position of the fund, and the maximum number of credits that may be accumulated has been doubled, to 104.   See A. Freedman, Security Bargains Reconsidered: SUB, Severance Pay, Guaranteed Work 22 (The Conference Board 1978).

[13] Respondent argues that in fact the SUB plan provides benefits in an inverse relationship to seniority.   Respondent observes that, because seniority protects against layoff, the most senior employees are the least likely to receive SUB's, and by the time very senior employees are laid off their benefit payments may be reduced in amount pursuant to § 1.5 of the plan because the fund has been depleted by prior payments to less senior employees.   This argument ignores that particular components of a seniority program need not invariably provide greater benefits to more senior workers.   "Bumping" provisions, for example, may seldom be used by very senior employees, and yet they are unquestionably rights of seniority.   In any event, the record contains no evidence of the funding history of the steel industry SUB program that would permit us to draw any conclusion as to the probability of benefit payments being reduced pursuant to § 1.5.

A benefit need not be meticulously proportioned to longevity of service to constitute a perquisite of seniority, however, as long as it performs a function akin to traditional forms of seniority. In fact, the very factors the District Court cited to show that SUB's are not forms of seniority benefits are equally relevant to demonstrate that they are not compensation for services rendered. An employee receives no benefits if he has worked for fewer than two years when he is laid off or if he voluntarily terminates his employment. Such a threshold requirement is more characteristic of seniority provisions than of compensation; in fact, other seniority benefits of the collective-bargaining agreement between Republic and the Steelworkers are also available only to employees with two years' seniority.[14] Similarly, an employee cannot accumulate more than 52 credits at a time; any work performed after that ceiling is reached goes "uncompensated." Moreover, the amount of the benefit payment is determined by four factors, none of which appears designed to compensate for hours actually worked: the wage rate at the time of layoff (not at the time the credits were earned); the number of dependents of the employee; the amount of state unemployment compensation received; and the financial position of the benefit fund.

## IV

We conclude that the purpose and function of the steel industry SUB plan is to provide economic security during periods of layoff to employees who have been in the service of the employer for a significant period. Thus the benefits are in the nature of a reward for length of service, and do not represent deferred short-term compensation for services actually rendered. Accordingly, SUB payments are perquisites

---

[14] For example, an employee with two years' seniority who is laid off may exercise "bumping" rights over less senior employees in the seniority pool, or may transfer to another plant with priority over other applicants, including recently hired employees of the other plant.

of seniority to which returning veterans are entitled under the Act. The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*