**Marion J. IMEL, Plaintiff–Appellee,**

v.

**LABORERS PENSION TRUST FUND FOR NORTHERN CALIFORNIA, Defendant–Appellant.**

No. 88–15668.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1990.

Decided May 22, 1990.

Thomas E. Stanton, Stanton, Kay & Watson, San Francisco, Cal., for defendant-appellant.

Mark S. Flynn, U.S. Dept. of Labor, Washington, D.C., for plaintiff-appellee.

Before CHOY, THOMPSON and TROTT, Circuit Judges.

THOMPSON, Circuit Judge:

The Laborers' Pension Trust Fund for Northern California ("Fund") appeals the district court's judgment, after a bench trial, granting Marion J. Imel ("Imel") pension credit for the time Imel spent in military service. The Veteran's Readjustment Act (the "Act")[1], 38 U.S.C. § 2021 et seq.

---

1. Section 2021 states in relevant part:

(a) In the case of any person who is inducted into the Armed Forces of the United States under the Military Selective Service Act (or under any prior or subsequent corresponding law) for training and service and who leaves a position (other than a temporary position) in the employ of any employer in order to perform such training and service, and (1) receives a certificate described in section 9(a) of the Military Selective Service Act (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—

. . . . .

(B) if such position was in the employ of a State, or political subdivision thereof, or a private employer, such person shall—
(i) if still qualified to perform the duties of such position, be restored by such employer or the employer's successor in interest to such position or to a position of like seniority, status, and pay;

. . . . .

unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so.

. . . . .

(b)(1) Any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section shall be considered as having been on furlough or leave of absence during such person's period of training and service in the Armed Forces, shall be so restored or reemployed without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without cause within one year after such restoration or reemployment.

(2) It is hereby declared to be the sense of the Congress that any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section should be so restored or reemployed in such manner as to give such person such status in the person's employment as the person would have en-

(1982), requires that an employee who leaves employment for compulsory military service and returns to the same employer not lose his position, seniority or status because of his military service. The Fund argues that because it never employed Imel, the district court did not have jurisdiction under section 2022 which creates jurisdiction in the district court for suits by a person returning from compulsory military service against his previous employer. The Fund also argues that Imel did not return to his previous employer because, upon his return from military service, while he returned to work in the Northern California construction industry, the Union dispatched him to work for a different construction company within that industry. We have jurisdiction under 28 U.S.C. § 1291 (1982) and we affirm.

## FACTS

The Fund was established in 1963 by two groups of contractors (two chapters of the Associated General Contractors of America) and the Northern California District Council of Laborers ("Union"). Under the Fund's pension plan ("Plan"), individual contractors make contributions for each hour paid and/or worked by covered employees. To qualify for a pension, the employee must earn a minimum amount of industry service-year credits. Credit is given for work done during the years 1937–1962, before the Fund was created. Credit is earned for each incident of employment with any covered contractor within the industry, even though the employment may have been of short duration or for different contractors. The amount of a covered employee's retirement pension is based upon the number of credits the employee has earned.

The Plan was amended by the trustees on October 18, 1977, retroactive to June 1, 1976, to provide that a person returning from compulsory military service would receive credit for his period of military service if he "was employed in a permanent position ... immediately prior to such military service and was reemployed by the employer for whom he was working immediately prior to his entry into such military service." Plan, Article 6, § 6.02a.

Imel worked in the Northern California construction industry for over twenty-five years. He joined the Union in 1951 and was dispatched from the Union hiring hall to various contractors consistently until his retirement in 1979. His general pattern was to work for several weeks, or months, on a project until he was laid off or until the project was finished, then to be put on

joyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment.

Section 2022 states in relevant part:

If any employer, who is a private employer or a State or political subdivision thereof, fails or refuses to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or section 2024, the district court of the United States for any district in which such private employer maintains a place of business, or in which such State or political subdivision thereof exercises authority or carries out its functions, shall have the power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits provided for in such provisions. The court shall order speedy hearing in any such case and shall advance it on the calendar. Upon application to ... such United States attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney.... No fees or court costs shall be taxed against any person who may apply for such benefits. In any such action only the employer shall be deemed a necessary party respondent.

The Act has been recodified several times: The Selective Training & Service Act of 1940, ch. 720, § 8(b), 54 Stat. 890, reenacted as The Military Selective Service Act of 1967, 50 U.S.C. App. § 459 (1970), reenacted as the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2021 et seq. *See Monroe v. Standard Oil Co.*, 452 U.S. 549, 554 n. 8, 101 S.Ct. 2510, 2514 n. 8, 69 L.Ed.2d 226 (1981); *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 194 n. 2, 100 S.Ct. 2100, 2103 n. 2, 65 L.Ed.2d 53 (1980). For clarity, we refer to the most recent codification, as no relevant changes have been made. *Barrett v. Grand Trunk W. R.R. Co.*, 581 F.2d 132, 133 n. 2 (7th Cir.1978), *cert. denied*, 440 U.S. 946, 99 S.Ct. 1423, 59 L.Ed.2d 634 (1979).

the out-of-work list for a few days (up to one month) until a new project was available. His employment was interrupted by his compulsory military service in the Korean War, from March 6, 1953 to March 5, 1955. Upon his return, Imel worked for a contractor covered by the Fund, but this contractor was not the same contractor he had worked for immediately prior to his military service.

The district court found that the Union operated a *de facto* "hiring hall" for the industry in Northern California during the relevant period. The Union controlled the dispatch of employees to the pension-covered jobs throughout the industry. "Use of that practice essentially guaranteed that as long as plaintiff sought work by registering at the Union hall he would be dispatched to jobs covered by the pension plan here in dispute." *Imel v. Laborers Pension Trust Fund*, No. S–83–1406EJG, mem. op. at 13, 1988 WL 156769 (E.D.Ca., Oct. 25, 1988). The Union hiring hall process "was treated as mandatory for obtaining work." *Id.* at 14. The district court also found that "there is a reasonable certainty that plaintiff's pension benefits would have continued to accrue in full" absent military service. *Id.* at 17.

The district court found that Imel's position was not temporary, because he "had a reasonable expectation that, but for the brief interruption during which he served in the military, he would have continued to work in [the Northern California construction] industry under the multi-employer pension plan." *Id.* at 22. The district court gave Imel credit for his two years of military service in computing his pension benefits. Imel's future pension payments were adjusted to reflect this credit, and the Fund was required to pay Imel a lump sum for total back-due benefits, plus prejudgment interest. The Fund appeals.

## ANALYSIS

### A. *Standard of Review*

#### 1. *General Rule*

 The interpretation of a statute is a question of law which we review de novo.

*See, e.g., Saratoga Sav. & Loan Ass'n v. Federal Home Loan Bank Bd.*, 879 F.2d 689, 691 (9th Cir.1989) (National Housing Act of 1934); *Batchelor v. Oak Hill Medical Group*, 870 F.2d 1446, 1447 (9th Cir. 1989) (ERISA). Findings of fact are reviewed under the clearly erroneous standard. Fed.R.Civ.P. 52(a); *Kruso v. International Tel. & Tel. Corp.*, 872 F.2d 1416, 1421 (9th Cir.1989).

#### 2. *ERISA and Deferential Review*

 The Fund contends that the district court should have deferred to the trustee's interpretation of the Plan. *See Malhiot v. Southern Cal. Retail Clerks Union*, 735 F.2d 1133, 1135 (9th Cir.1984) (eligibility decisions by trustees not reversed unless "arbitrary, capricious, made in bad faith, not supported by substantial evidence ..."). As the district court stated, however, the question is not whether the trustees properly interpreted the Plan, but whether the Fund is required to provide seniority benefits to Imel under the Act. Private parties may not agree to alter statutory duties. *See Fishgold v. Sullivan Drydock & Repair Corp.*, 328 U.S. 275, 285, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946). The court makes its own determination regarding requirements of the Act and will reverse a trustee's decision if it is "erroneous on a question of law." *Malhiot*, 735 F.2d at 1135.

### B. *Jurisdiction*

 The Fund argues that the district court did not have jurisdiction because section 2022 only creates a right of action against an "employer," and the Fund did not employ Imel.

Imel and the Labor Department contend that the Northern California construction industry was Imel's employer. They argue that because of the circumstances prevalent in that industry, it is difficult to name one party which served as Imel's employer in the literal sense of the word. They assert that Imel had an employer-type relationship with a number of "employers." First, they point out that Imel was paid and supervised by the individual contractors

covered by the Union hiring hall. Second, he was hired by, directed by, and responsible for reporting to the Union. Third, the Fund recorded and administered all pension benefits. All three of these circumstances are traditionally "employer" functions, say Imel and the Labor Department, and thus in the Northern California construction industry, no one entity controls the employee in all aspects of the employment relationship.

Essentially, the Fund's argument is that we ought to give the word "employer," as used in the statute, its plain meaning. As the Second Circuit described this argument in *Korea Shipping Corp. v. New York Shipping Ass'n,* 880 F.2d 1531, 1532 (2d Cir.1989), the Fund "argue[s] in effect that the [district court's] wholly different reading of the word 'employer' reinforces the notion that words don't mean what they say but only, as Alice tells us, what we say they mean." *Id.* (citing L. CARROLL, ALICE'S ADVENTURES IN WONDERLAND (London 1865)). Having stated the argument, the Second Circuit answered it:

> it is the task of judges to start with the language of a statute and to reach a judgment that applies that language to a particular set of circumstances in a manner consistent with the statute's stated objectives. The fallacy in the [defendants'] argument is their failure to recognize that in construing a statute, the task of the courts is to interpret the words of the statute in light of the purposes that animated the lawmakers in enacting it.

*Id.* at 1537 (holding that common law or dictionary meaning of term "employer" is inappropriate in the context of a remedial and protective statute).

We agree with the view taken by the Second Circuit. A narrow reading of the word "employer" as used in the Act is inconsistent with the statute as a whole. The purpose of the Act is to ensure that the veteran "who was called to the colors not be penalized on his return by reason of his absence from his civilian job." *Fishgold,* 328 U.S. at 284, 66 S.Ct. at 1111. The Act is to be liberally construed in light of

this purpose. *See Coffy,* 447 U.S. at 196, 100 S.Ct. at 2104–05; *Alabama Power Co. v. Davis,* 431 U.S. 581, 584, 97 S.Ct. 2002, 2004–05, 52 L.Ed.2d 595 (1977); *Fishgold,* 328 U.S. at 285, 66 S.Ct. at 1111; *Lang v. Great Falls School Dist. No. 1 & A,* 842 F.2d 1046, 1048 (9th Cir.1988); *Earls v. Atchison, Topeka & Santa Fe Ry.,* 532 F.2d 133, 136 (9th Cir.1976). Congress has manifested extreme solicitude for the returning veteran, *Carter v. United States,* 407 F.2d 1238, 1251 (D.C.Cir.1968) (supp. op.), and "made clear that claims under the Act are to be governed by principles of equity." *Lang,* 842 F.2d at 1051.

The Supreme Court has instructed us "to construe the separate provisions of the Act as parts of an organic whole and give each as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits." *Fishgold,* 328 U.S. at 285, 66 S.Ct. at 1111. Consistent with this teaching, we have taken the position that we will not "place undue emphasis on the parties' imprecise 'labels and definitions' to define 'rights guaranteed by the Act.'" *Lang,* 842 F.2d at 1050 (quoting *Smith v. Industrial Employers & Distributors Ass'n,* 546 F.2d 314, 317 (9th Cir.), *cert. denied,* 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977)). Our commitment to a liberal interpretation of the Act extends even to the question of jurisdiction. *Tsang v. Kan,* 173 F.2d 204, 205 (9th Cir.), *cert. denied,* 337 U.S. 939, 69 S.Ct. 1515, 93 L.Ed. 1744 (1949) (despite generally strict construction of jurisdiction); *see also Feore v. North Shore Bus Co.,* 161 F.2d 552, 553–54 (2d Cir.1947) (finding jurisdiction to award back pay when reinstatement not sought, although the statute only provided for such awards "as an incident" to reinstatement).

Other courts have exercised jurisdiction over a pension fund, alone, despite the Act's language in section 2021 creating rights against an "employer," and despite the reference to "employer" in the jurisdictional grant of section 2022. *See, e.g., Voliva v. Seafarers Int'l Union of N. Am.,* 680 F.Supp. 216 (E.D.Va.), *aff'd,* 858 F.2d 195 (4th Cir.1988) (all defendants except the pension plan dismissed early in the

case); *Akers v. Arnett,* 597 F.Supp. 557 (S.D.Tex.1983), *aff'd,* 748 F.2d 283 (5th Cir. 1984) (suit against trustees of longshoremen's association pension fund); *United States ex rel. Reilly v. New England Teamsters & Trucking Indus. Pension Fund,* 737 F.2d 1274 (2d Cir.1984) (district court held that the pension fund was the employer; defendant fund did not argue this issue on appeal).

In *Grzyb v. The New River Co.,* 793 F.2d 590 (4th Cir.1986), the employer was joined as a defendant and then the claim against it was dismissed because of laches. Despite the lack of the "employer" as a continuing party, the *Grzyb* court held that the pension plan incorrectly denied past military service time credit and affirmed judgment against the plan alone.

> In considering the proper application of § 2022, it is important to note, first, that there is substantial case law to the effect that the remedies provided in the Veterans Act are equitable in nature. Second, there is a strong public policy against the forfeiture of pension benefits ... and turning specifically to the provisions of the Veterans Act, strong authority that the Act is to be treated liberally, so as to benefit those who have served in the armed forces.

*Id.* at 592 (citations omitted).

The First Circuit has taken a somewhat hybrid approach to how the term "employer" should be treated in the Act. In *Bunnell v. New Eng. Teamsters & Trucking Indus. Pension Fund,* 655 F.2d 451 (1st Cir.1981), *cert. denied,* 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982), the district court had held that the fund was the employer for purpose of the Act, although not in the traditional sense. *Bunnell,* 486 F.Supp. 714, 718 (D.Mass.1980). The First Circuit affirmed, but stated that it was "not concerned" with whether the pension fund could be defined as an employer. *Bunnell,* 655 F.2d at 452.

> Where, however [the employer] contracted for Fund to assume obligations for its employees' past services that treated returned veterans less favorably than its other employees, [the employer] directly

violated the Act. It must equally be a violation for Fund to participate, and apply [the employer's] contributions to inure to the benefit of nonveteran employees and discriminate against veterans. *Id.* The First Circuit had "no difficulty in fashioning this remedy, or in the concept that suit may be brought directly against the Fund." *Id.* at 453 (citing the Ninth Circuit decision in *Smith* ).

In view of the remedial nature of the Act, the Supreme Court's teaching that the Act should be given "as liberal a construction for the benefit of the veteran as a harmonious interplay of the separate provisions permits," *Fishgold,* 328 U.S. at 285, 66 S.Ct. at 1111, this circuit's commitment to a liberal interpretation of the Act consistent with *Fishgold,* and decisions from other circuits which have reached the same result, we hold that the district court had jurisdiction over Imel's suit against the Fund.

### C. *The Employer as a "Necessary Party"*

█ The Fund also argues that Imel's suit against it is fatally flawed because Imel's employer is a "necessary party," and no employer was sued.

The last sentence of section 2022 of the Act provides: "In any such action only the employer shall be deemed a necessary party respondent." Act, § 2022. This language was included to simplify the procedure for veterans asserting claims. *Bunnell,* 486 F.Supp. at 720. "If those parties [unions, other employees and other parties] had been *necessary,* individual veterans would have been greatly discouraged from asserting meritorious claims by the cumbersomeness and expense of litigation." *Id.*

Here, the Fund is the only party with a significant interest in the proceeding, it is the party who will provide any relief, and in light of the objectives of the Act it is the only appropriate party for Imel to hale into court in this litigation. *See* 1963 Fund Plan, Art. VII, § 1 ("no Individual Employer has any liability, directly or indirectly, to provide the benefits established by this

Plan beyond the obligation of the Individual Employer to make contributions as stipulated in the Collective Bargaining Agreement"). To mechanically *require* the addition of individual construction industry contractors for whom Imel worked "would be, in many cases, to convert what was intended as a favor into a burden." *Tsang,* 173 F.2d at 206 (italics deleted) (quoting *Ames v. Kansas,* 111 U.S. 449, 464, 4 S.Ct. 437, 444, 28 L.Ed. 482 (1884)). "The remedy was intended to be simple and prompt." *United States ex rel. Deavers v. Missouri, K. & T.R. Co.,* 171 F.2d 961, 963 (5th Cir.), *cert. denied,* 337 U.S. 958, 69 S.Ct. 1533, 93 L.Ed. 1757 (1949); *see Donner v. Levine,* 232 F.2d 185, 187 (2d Cir.1956).

We conclude that Imel may maintain his suit against the Fund notwithstanding the absence of any of Imel's construction contractor employers as a party in the litigation.

### D. *Imel's Return to Employment*

■ The Fund argues that even if Imel may maintain his suit against the Fund and may do so without including any construction contractor employer as a defendant, he still loses because he did not return to work for the same construction contractor he had worked for immediately prior to entering military service. We disagree. Imel returned to the appropriate party—he went through the same Union hiring hall[2] procedure as he did before his military service and was assigned to a contractor later covered under the pension plan for seniority credit. Imel had no control over where he was sent to work. Moreover, the district court found that benefits under the Plan were designed to reward an employee according to his length of service within the industry itself and not with any single contractor. This finding is consistent with the Fund's own documentation. The 1963 Fund Plan specifically provides: "During the periods between August 1, 1937 and August 1, 1962, an Employee shall be entitled to Past Service Credit for each Plan year, or a portion thereof, he was employed

in the Building and Construction Industry." 1963 Fund Plan, Art. IV, § 2(a).

The district court's focus on the industry as an employing unit is also supported by section 2021(a)(B)(ii) of the Act. That section provides that successors in interest must afford a veteran the same rights as their predecessors. Act, § 2021(a)(B)(ii). This language of the Act reflects Congress' desire for a broad right to reemployment and seniority, not limited by technical changes in corporate form or reorganization. In the Northern California construction industry, the multi-employer group is made up of changing employer members: contractors enter and leave the area and go in and out of business. Nonetheless, the multi-employer group is a consistent entity, bound by its collective bargaining agreements with the Union and its participation in the trust which created the Fund.

The Fund argues that the district court's decision creates a huge financial burden on the Fund and the construction industry because it requires that pension credits be given to all persons returning from compulsory military service who return to the Northern California construction industry, without regard to whether they return to the same employer for whom they worked immediately preceding their military service. We reject this economic argument. The Act's "very important but limited purpose is to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service." *McKinney v. Missouri–Kan. Tex.R.R. Co.,* 357 U.S. 265, 272, 78 S.Ct. 1222, 1226, 2 L.Ed.2d 1305 (1958). As the district court found, Imel had been continually employed in the construction industry at the time he was called to military service. Had it not been for military service, he would have continued in that employment, and indeed he returned to that employment upon his military discharge. Had it not been for his military service, Imel would have received seniority credit which others who continued their

***

2. The Fund does not dispute the district court's finding of a hiring hall.

employment in the Northern California construction industry received. The district court's holding, which we affirm, may increase the financial burden upon the Fund, and as a result, the burden upon the Northern California construction industry. But this result is compelled by the Act. Imel's rights as a returning serviceman may not be subordinated to the Fund's and the construction industry's financial interests.

We conclude that by returning to work in the Northern California construction industry following his discharge from military service, Imel returned to the same "employer" for purposes of the Act.

### E. *The Employment Position Imel Left*

■ Finally, the Fund argues that Imel failed to satisfy the requirement of section 2021(a) of the Act which provides that in order to be protected by the Act's seniority provisions, the returning veteran must show that he left a position, other than a temporary position, for military service. The Fund points out that Imel's employment by his last construction contractor preceding his military service was only casual, and the project he was working on for that contractor was of only limited duration. Thus, it is contended, Imel held only a temporary position when he was called into the service. We disagree.

The test for whether a position is other than temporary and subject to the Act "is whether the veteran, prior to his entry into military service, had a reasonable expectation, in light of all of the circumstances of his employment, that his employment would continue for a significant or indefinite period." *Stevens v. Tennessee Valley Auth.*, 687 F.2d 158, 161 (6th Cir.1982). Thus, for example, a seasonal employee may have a reasonable expectation of reemployment on the same seasonal terms.

See *Stevens*, 687 F.2d at 162; *United States v. North Am. Creameries, Inc.*, 70 F.Supp. 36, 38 (D.N.D.1947).

Here, the district court found that Imel "had a reasonable expectation that, but for the brief interruption during which he served in the military, he would have continued to work in the [Northern California] construction industry under the multi-employer pension plan in question and accordingly would have continued earning pension credits." *Imel*, mem. op. at 22. This finding is not clearly erroneous.[3] It establishes the basis for concluding that Imel's pre-service employment was not of a temporary nature. His employment was in the Northern California construction industry working for construction contractors in the multi-employer group; and he was continuously so employed for more than twenty-five years, except for the two years he spent in military service during the Korean War.

The district court's judgment is AFFIRMED.

TROTT, Circuit Judge, dissenting:

The majority opinion reaches its result by effectively stretching the word and the concept "employer" beyond all recognition, giving it new meaning that no ordinary person could possibly anticipate or comprehend. All of a sudden, "employer" includes possibly an industry as a whole, a trust fund, or a union of which Mr. Imel was a member but for which he never worked. Unions in this circuit, as the Fund in this case, will certainly be surprised to discover that their members may be really their employees for certain purposes, and they will be more than interested to discover that they may have unexpected financial responsibilities for which no provisions

---

**3.** The district court's finding is also supported by Imel's accumulation of preferential hiring rights for his work in the Northern California construction industry, rights which he had accumulated preceding his military service.

The accumulation of preferential hiring rights makes the position non-temporary by investing it with an expectation of reemployment.... In fact, the prior accumulation of any seniority or length of service benefit

which would otherwise be protected by the Act, [cites], is itself evidence that the returning veteran held something other than a temporary position. The accumulation of seniority-related benefits would not normally be a characteristic of a temporary position, as that term is used in the Act, *i.e.*, a "casual" position.

*Stevens*, 687 F.2d at 162.

have been made. I find the Second Circuit's answer to the "Alice in Wonderland" indictment of this type of abuse of the English language and the plain meaning of words to be unpersuasive. We *construe* statutes, yes, but we do not redefine words, especially when the redefinition carries important policy implications with it. That is up to the people who write dictionaries or Congress—not judges. The majority opinion calls this a "liberal construction" of the key word and the statute: I respectfully see it as verbal anarchy.

The majority opinion rewrites the law to achieve a desirable result. What it says is that as a matter of *policy*, Mr. Imel and people similarly situated should also receive the benefits of the Veteran's Readjustment Act. Maybe so, but if we are to respect the concept of separation of powers and the prerogative of the legislature, that call should be made by Congress. What we believe Congress would have done if they had confronted this policy issue is irrelevant. This is not a case where we are called on to iron out fuzzy language. What is at stake is what the judiciary sees as the limits of its authority.

The Fund argues with vigor that what the majority does creates a huge financial burden on the Fund for which no provisions have been made. The majority opinion waves this off as an "economic argument." I see it as something a legislature would want to consider seriously.

Were I a member of Congress, I might find myself very sympathetic to the majority's policy reasons for wanting to include people like Mr. Imel within the scope of this Act. But as a judge, I must regrettably tell him he is in the wrong forum.

I would dismiss this case for lack of jurisdiction under 38 U.S.C. § 2022.

I dissent.