Jimmie L. WINDERS, Plaintiff,

v.

PEOPLE EXPRESS AIRLINES, INC., Defendant.

Civ. A. No. 84-1328.

United States District Court, D. New Jersey.

Oct. 23, 1984.

As Amended Nov. 7, 1984.

Pfaltz & Woller by Hugo M. Pfaltz, Jr., Summit, N.J., William H. Frappollo, New York City, for plaintiff.

Jeffrey M. Bernbach, New York City, for defendant.

## OPINION

DEBEVOISE, District Judge.

This matter is before the court on cross-motions for summary judgment. The parties seek a determination of plaintiff Jimmie L. Winders' employment status with defendant People Express, and his rights to ownership of stock purchased pursuant to defendant's stock purchase plan.

### Statement of Facts and Procedure

Plaintiff became employed by defendant on March 9, 1981 as a Flight Manager or Pilot, a full time, non-temporary position. At the time of his employment with defendant, plaintiff was a member of the Air National Guard and held the rank of Major. Plaintiff informed defendant of this fact at the time he was hired. Plaintiff flew regularly as a pilot for defendant beginning on its first day of operation (April 3, 1981) and also operated as a check pilot, which involved the examination of new pilots who went through pilot training at the United Airlines facility in Denver, Colorado.

As a condition of his employment with defendant, plaintiff was required to, and, on May 31, 1981, did, purchase 500 shares of defendant's common stock. At the same time, plaintiff also voluntarily subscribed to 2,000 shares of common stock. He executed two promissory notes, one in the amount of $1,495 for the mandatory 500 shares and the second in the amount of $10,980 for the 2,000 optional shares. Plaintiff paid a total of $305 toward the $1,495 promissory note through payroll deductions. His total payment on the $10,980 promissory note was $5,519 which consisted of a $20 (par value) cash payment, a down payment of $3,667 and payroll deductions of $1,832. On August 14, 1981, plaintiff fully paid for an additional 500 shares of optional stock for a purchase price of $4,250.

The installments on the lesser note were to be made through payroll deductions in 120 semi-monthly installments beginning June 15, 1981 and ending on May 31, 1986. Plaintiff later renegotiated the terms of the larger note, extending the payment term by one year (to May 31, 1983), and providing for payroll deductions on a semi-month-

ly basis beginning February 15, 1982. Upon his initial payment for all shares, plaintiff had full voting rights for all shares.

Plaintiff purchased all stock pursuant to defendant's Restricted Stock Purchase Plan. The pertinent provisions of the plan read as follows:

*Restrictions on Stock Purchased.* FOR A PERIOD OF TIME PRE-SCRIBED BY THE BOARD OF DI-RECTORS PURSUANT TO THE PLAN, A PARTICIPANT MAY NOT SELL, AS-SIGN, TRANSFER, PLEDGE OR OTH-ERWISE ENCUMBER OR DISPOSE OF ANY SHARES OF COMMON STOCK ACQUIRED PURSUANT TO THE PLAN. If a participant leaves the employ of People Express or, in the case of directors who are not also employees of the Company, ceases to be a director (other than by reason of death, disability or retirement at normal retirement age) at any time prior to a date fixed by the Board, the Company may, but is not obligated to, purchase any shares then held by such participant that are subject to such restrictions on transferability. If the Company elects not to purchase such shares, all restrictions on such shares will thereupon lapse, and such shares thereafter will not be subject to forfeiture under the Plan.

The Board of Directors has determined that, with respect to any shares of Common Stock that an employee is required to purchase pursuant to the Plan, restrictions as to 20% of such shares will lapse on the second anniversary of his award. Restrictions as to an additional 20% of such shares will lapse on each subsequent anniversary, and all restrictions will lapse on the sixth anniversary of the employee's award. The Board of Directors has also determined that all restrictions on the transferability of shares acquired pursuant to the Plan at the option of a participant will lapse two years after the date on which the purchase price of such shares was fully paid. If a participant dies, becomes disabled or retires at normal retirement age, all restrictions on shares then held by such participant, regardless of whether or not the participant was required to purchase such shares, will lapse automatically.

*Rights as Stockholders.* Subject to the restrictions on transferability referred to above, a participant has all the rights of a stockholder with respect to shares acquired under the Plan from the date of acceptance of his award, including the right to vote such shares and to receive any dividends paid thereon.

At the time that plaintiff ceased working as a pilot for defendant in May 1982, he had paid a total of $10,074 toward the purchase of the 3,000 shares for which he had subscribed. Of that amount, $4,250 was full payment for the 500 optional shares purchased by plaintiff on August 14, 1981.

In early 1982, plaintiff was asked by Colonel Jack Keir of the National Guard Bureau in Washington, D.C., if he would consider returning to active duty with the Air National Guard to work on a special project called the National Air Space Review. Colonel Keir advised plaintiff that the position would become vacant in April or May 1982, and that it would be a 42 month program. After considering the offer, plaintiff informed Colonel Keir sometime between April 9th and April 14th that he would accept the position.

From May 17, 1982 to May 28, 1982, plaintiff was on paid vacation with defendant. By orders dated April 16, 1982 plaintiff was directed to commence extended active duty on May 17, 1982 for a period of 24 months at Air National Guard Support Center, Andrews Air Force Base, Maryland. Plaintiff duly reported for duty pursuant to those orders.

On May 28, 1982, the last day of plaintiff's paid vacation, plaintiff spoke with Mr. Harold J. Pareti, Chief of defendant's Flight Operations, and Mr. Jim Barral, defendant's Chief Pilot. Plaintiff requested of them a 48 month military leave of absence and also inquired whether he could continue in the stock plan while in military service. Plaintiff did not at that point, however, inform Mr. Pareti and Mr. Barral

that he was already on active military duty with the Air National Guard. Mr. Pareti told plaintiff that he was expected to report for work on May 31, 1982, after plaintiff's vacation was over. Plaintiff replied that he would not be there, and has not performed as a pilot for defendant since then. In a letter dated May 28, 1982, the same date on which the above described conversation took place, plaintiff repeated his request for a 48 month military leave of absence and stated that he had been assigned to the National Guard.

In a number of letters dated July 26, August 16, and November 9, 1982, plaintiff, through his counsel, made inquiries of defendant as to the status of his request for military leave. On August 3, 1982, Mr. Pareti requested that plaintiff supply a copy of his "orders to active duty", which plaintiff duly supplied. Plaintiff received no further communication from defendant until September 6, 1983 when, by letter from its counsel, defendant informed plaintiff's counsel that plaintiff's request for military leave was denied. With that letter, defendant also tendered to plaintiff a check for $10,074, the total amount that plaintiff had paid toward the purchase of the stock. Defendant also informed plaintiff that his promissory notes were cancelled.

On January 9, 1984, plaintiff was issued new orders which extended his tour of active duty for two years. Thus, plaintiff is now on active duty and will remain on active duty until May 16, 1986. His period of active duty will therefore extend for the full 48 months for which he requested a military leave of absence.

On July 18, 1983, defendant's common stock was the subject of a two-for-one stock dividend for shareholders of record on June 17, 1983. On September 6, 1983, the date that defendant repurchased plaintiff's shares, defendant's common stock was being traded at $21⅞ per share. Thus, the 3,000 shares that plaintiff claims to own would have become 6,000 shares on July 18, 1983, and would have been worth $131,240 on September 6, 1983.

Plaintiff brought suit on April 4, 1984, alleging that defendant had violated his rights under the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. §§ 2021–2026 ("the Act"), which is part of the Veterans' Reemployment Rights Act. Plaintiff claims that defendant violated the Act by repurchasing plaintiff's 3,000 shares of stock for $10,074 when the shares had a value of approximately $131,000 as reported in the Wall Street Journal on September 6, 1984. The relief for which plaintiff asks includes a decree that plaintiff had been terminated from defendant's employ in violation of the Act, and payment to plaintiff for the stock that was "wrongfully appropriated" by defendant on September 6, 1983.

Defendant answered on April 18, 1984 and alleged several affirmative defenses including failure to state a claim upon which relief can be granted, and plaintiff's lack of standing. Defendant also alleged that plaintiff is estopped from pursuing his claims because: (1) he voluntarily left defendant's employ without defendant's permission or authorization when he reentered active duty with the Air National Guard on May 17, 1982; and (2) he defaulted on all payments due on the promissory notes that he had executed for the purchase of the stock. Defendant asked that the complaint be dismissed.

Defendant moved to dismiss or for summary judgment. Plaintiff cross-moved for summary judgment and for leave to amend the complaint and for summary judgment on the amended complaint. Plaintiff's proffered amendment alleges that defendant anticipatorily breached the terms of the Restricted Stock Purchase Plan by repurchasing plaintiff's stock on September 6, 1983. Plaintiff requested relief in the form of a declaration that he had been on military leave of absence since May 28, 1982. In addition, he asked that, pursuant to the terms of the Plan by which unrestricted stock accrues to the purchaser over the course of employment, he be adjudged the unrestricted owner of a total of 4,000 shares as of May 1, 1985. Plaintiff also seeks damages.

*Discussion*

In order to prevail on a motion for summary judgment, the moving party must prove that "there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A motion for summary judgment may only be granted if there are no disputes as to material facts requiring a full trial. *Bryson v. Brand Insulation, Inc.*, 621 F.2d 556, 559 (3d Cir.1980).

All of the issues and allegations set forth by both parties in this matter turn on one threshold question: Did plaintiff resign his position with defendant when he returned to active duty with the Air National Guard, or did plaintiff enter into a military leave of absence from defendant's employ at that time? If plaintiff resigned, then he forfeited his right to ownership of the stock. If, however, pursuant to the Vietnam Era Veterans' Readjustment Assistance Act of 1974, 38 U.S.C. § 2021 et seq., plaintiff was on military leave, then at least some of his claims regarding the stock are meritorious.

■ The first issue which must be addressed is defendant's contention that plaintiff lacks standing to sue under the Act because he not only has not demanded reinstatement with defendant, but has not fulfilled the prerequisites for reemployment under the Act. Section 2021(a) of the Act provides that in order to be eligible for reemployment under the Act, a person (a) must be discharged from military service, (b) have received a certificate of satisfactory completion of service, and (c) must make application for reemployment within 90 days from his release from duty. Defendant argues that since plaintiff is currently on active military duty and has not requested reemployment, he lacks standing to maintain an action under the Act.

Plaintiff, however, argues that his rights arise not under § 2021(a), but under § 2024(b)(1) which provides the same reemployment rights for reservists and National Guardsmen that § 2021(a) provides for inductees. *See generally* 1961 *U.S.Code Cong. & Admin.News*, 3319–20; Pub.L. 97–252, Title XI, § 1130, Sept. 8, 1982, 96 Stat. 759. Section 2024(b)(1) reads as follows:

Any person who, after entering the employment on the basis of which such person claims restoration or reemployment, enters upon active duty (other than for the purpose of determining physical fitness and other than for training), whether or not voluntarily, in the Armed Forces of the United States or the Public Health Service in response to an order or call to active duty shall, upon such person's relief from, active duty under honorable conditions, be entitled to all of the reemployment rights and benefits provided for by this chapter in the case of persons inducted under the provisions of the Military Selective Service Act (or prior or subsequent legislation providing for the involuntary induction of persons into the Armed Forces), if the total of such active duty performed between June 24, 1948, and August 1, 1961, did not exceed four years, and the total of any such active duty, additional or otherwise, performed after August 1, 1961, does not exceed four years (plus in each case any additional period in which such person was unable to obtain orders relieving such person from active duty.)

The reference in the above provision to "reemployment rights and benefits provided for in this chapter" include those set forth in § 2021(b)(1) and (b)(2):

(b)(1) Any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section shall be considered as having been on furlough or leave of absence during such person's period of training and service in the Armed Forces, shall be so restored or reemployed without loss of seniority, shall be entitled to participate in insurance or other benefits offered by the employer pursuant to established rules and practices relating to employees on furlough or leave of absence in effect with the employer at the time such person was inducted into such forces, and shall not be discharged from such position without

cause within one year after such restoration or reemployment.

(2) It is hereby declared to be the sense of Congress that any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section should be so restored or reemployed in such manner as to give such person such status in the person's employment as the person would have enjoyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment.

Under these provisions of the Act, plaintiff does have current rights since he is seeking to preserve what are, in effect, seniority benefits that will accrue to him if he is found to be on military leave of absence. The right of ownership in the stock can be considered a perquisite of seniority because, under the Restricted Stock Purchase Plan, the longer one is employed by defendant, the more shares of stock become freed of the restriction on transferability. All restrictions on mandatorily purchased stock lapse after 6 years of employment, and restrictions on shares purchased at the option of the employee lapse two years after payment in full of the purchase price. Thus, the increased value of the stock to employees is a benefit that is a reward for length of service. *See Alabama Power Co. v. Davis,* 431 U.S. 581, 97 S.Ct. 2002, 52 L.Ed.2d 595 (1977).

Again, however, plaintiff will not have those seniority rights if he is found to have resigned his position with defendant rather than to be on military leave of absence.

In support of his contention that he is on military leave, plaintiff again notes that § 2024(b)(1) provides a reservist or National Guardsman on active duty with the same rights as an inductee. He then refers to § 2021(b)(1) which concerns veterans who have been reemployed and which states that such veterans "shall be considered as having been on furlough or leave of absence during ... [military] service." Plaintiff claims that since veterans are to be considered as having been on leave of absence when they return, it is clear that while they are gone they are on a statutory leave of absence. This position is supported by two Third Circuit decisions holding that the employment relationship continues throughout an employee's military service, and that such an employee's rights to benefits are protected during his absence. *Hoffman v. Bethlehem Steel Corp.,* 477 F.2d 860 (3d Cir.1973); *MacLaughlin v. Union Switch and Signal Co.,* 166 F.2d 46 (3d Cir.1948).

Defendant contends that plaintiff cannot be on leave of absence because he is not now, and has not in the past, sought reemployment. It is clear, however, from plaintiff's correspondence with defendant that he reentered active duty in the Air National Guard with the intention of returning to defendant's employ at the end of his tour of duty. In his first letter to defendant's Chief of Flight Operations, Harold Pareti, dated May 28, 1982 (the same day on which he verbally requested a leave of absence from Mr. Pareti and Mr. Barral), plaintiff stated:

> I request a military leave of absence in order to participate in the National Airspace Review. I will be assigned to the National Guard Bureau in Washington, D.C.
>
> The anticipated time frame for this project is 42 months. I am therefore requesting a 48 month leave of absence to cover any unexpected delays or extensions.

This letter evidences an intent to return to defendant's employ at the end of the requested 48 month leave of absence and gives notice to defendant of that intent. In any event, plaintiff's failure to request reinstatement at this time is not relevant to the matter at hand. Plaintiff is currently on active military duty and is not in a position to seek reemployment at People Express. As stated earlier, however, plaintiff does have the right to seek to protect his seniority benefits in anticipation of his reemployment at the end of his 48 months of active duty.

Defendant next contends that plaintiff is not on leave of absence under the Act because he resigned his employment with defendant. Defendant argues that plaintiff's assumption of his duties with the Air National Guard eleven days before requesting a military leave of absence constituted a resignation. Defendant, in the course of this argument, proceeds to confuse the issue of resignation by stating that plaintiff requested leave after accepting new employment with the Air National Guard and that the acceptance of that employment constituted a resignation. This argument lacks merit since the "employment" which defendant alleges that plaintiff accepted was his entry into active military duty. Plaintiff did not resign his position with defendant to take a new job, but interrupted his employment to go into the military service.

 The United States Supreme Court has stated that the Reemployment Act (of which the Vietnam Era Veterans' Readjustment Assistance Act is a part) is to be "liberally construed", *Coffy v. Republic Steel Corp.*, 447 U.S. 191, 196, 100 S.Ct. 2100, 2104, 65 L.Ed.2d 53 (1980), and the federal courts have followed that direction, particularly in determining whether one who has entered military service has resigned his or her employment. The general rule is that "a resignation from civilian employment to enter military service does not deprive a veteran of employment rights." *Hilliard v. New Jersey Army National Guard*, 527 F.Supp. 405, 410 (D.N.J. 1981). *Accord, Green v. Oktibbeha County Hospital*, 526 F.Supp. 49, 54–55 (N.D. Miss.1981); *Davis v. Halifax Cty. Sch. System*, 508 F.Supp. 966, 969 (E.D.N.C.1981); *Micalone v. Long Island Railroad Co.*, 582 F.Supp. 973, 978 (S.D.N.Y.1983).

In only one of the above cited cases, *Hilliard v. New Jersey Army National Guard, supra*, a case on which defendant relies, did the court find that a resignation had occurred. In that case, the court departed from the "basic rule of law" because of the "special circumstances involved". 527 F.Supp. at 410. There, the New Jersey Army National Guard (NJANG) had a policy requiring public employees to obtain the consent of their employers before entering active duty. The plaintiff, employed as a police officer, misrepresented his employment to the NJANG by informing it that he was self-employed. It was only after he had entered active duty and his misrepresentation was discovered that he obtained permission from the police department and was granted a leave of absence. While on National Guard duty, the plaintiff was recruited into the regular army, but was told he could only enter active duty there if he effectuated a retroactive resignation from the police department. The plaintiff then made what the court termed a "bona fide and legitimate severance of his employment relationship" with the police department. *Id.* The Court found that the plaintiff's resignation was required by the NJANG as a concession by the Department of Defense to the plaintiff so that the plaintiff could resolve the problem he had brought upon himself by his misrepresentations. *Id.*

In the other cited cases involving the resignation issue, the courts found that where an employee informed an employer that he was entering active military duty, that communication did not constitute a resignation. *Micalone v. Long Island Railroad Co.*, 582 F.Supp. 973 (S.D.N.Y. 1983); *Davis v. Halifax Cty. Sch. System*, 508 F.Supp. 966 (E.D.N.C.1981); *Green v. Oktibbeha Cty. Hospital*, 526 F.Supp. 49 (N.D.Miss.1981). This was so even where the employee used the word "resign" in his correspondence, *Micalone, supra* at 976, or otherwise tendered what could be considered a letter of resignation, *Davis, supra* at 969. It has also been held that even an employee's failure to notify her employer that she was leaving her job to enter military service does "not amount to a waiver under the Act since the Act does not require such notice." *Adams v. Mobile County Personnel Board*, 95 CCH Labor Cases ¶ 13,886 at 22,705 (S.D.Ala.1982), *citing Fortenberry v. Owen Bros. Packing Co.*, 267 F.Supp. 605 (S.D.Miss.1966), *aff'd*, 378 F.2d 373 (5th Cir.1967).

■ In the instant case, plaintiff did notify defendant that he was entering active military duty and he did not in any way state or suggest that he was tendering a resignation. Nor, as defendant argues, did plaintiff conduct himself in such a way as to categorically infer a resignation. He did not "quit" his job and then join the Air National Guard since he was on paid vacation from defendant when he was called to active duty. Furthermore, plaintiff's tour of duty is 48 months or four years, and is therefore within the length of time for a military leave of absence provided for in § 2024(b)(1) of the Act.

In view of the above facts, and in view of the liberal construction of the Act mandated by the United States Supreme Court, I find that plaintiff is currently on military leave of absence. Provided that plaintiff meets the other requirements of the Act, he will be entitled to reinstatement when he completes his active duty with the Air National Guard on May 16, 1986. Therefore, he will be entitled at that time to his seniority and benefits that accrue during his leave of absence.

■ I also find that, because plaintiff was on leave of absence at the time, defendant did not, on September 6, 1983, have the right to repurchase the 3,000 shares of stock purchased by plaintiff pursuant to the Restricted Stock Purchase Plan. While plaintiff thus retains rights under the plan, the difficulty in determining those rights is that, if the language of the statute were strictly construed, his rights to benefits which accrued during his military service do not become effective until his restoration to employment. The essence of plaintiff's rights under the plan is the periodic release of his shares from the transfer restrictions so that he can acquire an indefeasible ownership and sell if he deems it advantageous to do so. Were he required to wait until his return to employment to acquire unrestricted stock he might well lose the benefit provided by the plan and protected by the statute.

The benefit of periodic release of restrictions, however, is one that accrues with length of employment and is intended to encourage defendant's employees to remain with the company. It is protected by the Act only if plaintiff reenters defendant's employ. Thus, to allow plaintiff to assume total unrestricted ownership at this time could defeat the purpose of both the plan and the Act since plaintiff could reap the benefits of the plan now without ever returning to his position with defendant.

■ The Supreme Court has mandated that the Act be liberally construed, but it must not be applied so as to defeat its own purpose. Rather, it is necessary to find a means of preserving plaintiff's rights under the Act and the plan, while ensuring that the benefits to which he is entitled upon reemployment vest only at the time that he is actually reemployed. Given the treatment of plaintiff's status, equitable principles can be applied to fashion a remedy to protect plaintiff's rights under the stock purchase plan in accordance with the spirit and purpose of the Act.

In order to fashion an equitable remedy, it is helpful to restate the amount of stock purchased by plaintiff and the terms under which they were purchased. In May 1981, plaintiff subscribed for the purchase of 2,500 shares, 500 of which he was required to buy. He executed a promissory note in the amount of $1,495 for the purchase of the 500 shares at a price of $3 a share. He executed an additional promissory note for $10,980 for the purchase of the 2,000 shares at $5.50 a share. In August of 1981, plaintiff purchased an additional 500 shares at $8.50 per share for which he paid $4,250 in full. At this time, plaintiff has paid $305 toward the $1,495 note for 500 shares and $5,519 toward the $10,980 note for 2,000 shares. Thus, in total, plaintiff has paid in full for the 500 shares he purchased in August of 1981, and, of the shares he bought in May 1981, he has paid for approximately 100 of the 500 mandatorily purchased shares and approximately 1,000 of the 2,000 optionally purchased shares. Since there was a two-for-one stock dividend declared in July 1983, those 1,600 shares have become 3,200 shares fully paid for.

Under the Restricted Stock Purchase Plan, the stock that employees are required to buy becomes freed of its restriction on transferability in the following manner: restrictions on 20% of such stock lapse two years after purchase, and each year thereafter restrictions lapse on an additional 20% until the sixth year, when all restrictions lapse. Restrictions on stock purchased at option lapse two years after the purchase price on such shares is paid in full.

At the time that defendant repurchased plaintiff's stock, only the 500 shares purchased August 14, 1981 and fully paid for and a portion of the 500 mandatorily purchased stock had become free of restrictions. Those shares had doubled as a result of the stock split. Had plaintiff not been on a leave of absence at the time, he could have sold the shares at market price. Since there is no way of determining whether plaintiff would, in fact, have sold, it would seem fair to require defendant to pay to plaintiff the September 6, 1983 market price for one-half of the shares held by plaintiff that were both paid for in full and as to which restrictions on transferability had lapsed on that date. This consists of the 500 shares purchased on August 14, 1981 and a portion of the mandatorily purchased stock. That purchase price shall not, however, be paid to plaintiff at this time. It will be held by defendant until the time that plaintiff reenters defendant's employ. The remaining one-half of this group of stock shall be reissued to plaintiff and held by defendant also pending plaintiff's reemployment. If plaintiff is not reinstated, he will not be entitled to either the cash or the stock, but rather only to the purchase price he has paid.

As to the shares for which plaintiff has not paid in full, the situation is obviously different. Defendant claims that plaintiff is not entitled to these shares because he has not made any payments on the two promissory notes since he entered active military duty in May 1982. Several factors, however, lead me to conclude that plaintiff is entitled to ownership of those shares. First, the notes themselves provide for payment through payroll deduc-

tions and make no provision for payment when the employee is on leave of absence and not receiving a paycheck. Second, plaintiff did inquire of Mr. Pareti as to how plaintiff could remain in the Restricted Stock Purchase Plan while on military leave. Third, defendant delayed informing plaintiff of his employment status for 15 months, and thus also delayed in informing him of his rights as to the stock he had purchased. Thus, while plaintiff perhaps should have more vigorously pursued a means of continuing payment on his notes, defendant also had an obligation to inform plaintiff in a timely manner of his status as an employee and a stock owner. In this situation, I find that the most fair and equitable solution is to put both parties back into the position that they would have been in had neither party conducted himself or itself as he or it in fact did.

Plaintiff is thus directed to make back payments on both notes from the time of his last payroll deduction until the present. He will be required to make payments on the notes while he continues in military service at the times and in the amounts he would have paid had he remained in defendant's active employ. In turn, defendant must reissue all stock to plaintiff other than the shares for which defendant is required by this ruling to hold the September 6, 1983 market price for plaintiff. The reissued shares must also be held by defendant for plaintiff until plaintiff is reemployed.

The reissued shares of stock will become free of the transfer restrictions in the manner described in the Restricted Stock Purchase Plan. When shares become free, plaintiff may direct defendant to sell as many of those shares as plaintiff wishes. The price for those shares will be the market price on the date that plaintiff requests the sale. The proceeds shall be held for plaintiff by defendant until the time that plaintiff resumes his position with defendant.

At the time that plaintiff becomes reemployed, defendant shall deliver to plaintiff all unsold shares of stock. All proceeds

from shares that plaintiff has directed be sold, and the September 6, 1983 market price for one-half of plaintiff's paid for and unrestricted stock as of that date, shall be paid to plaintiff upon his reemployment. At that time defendant is also directed to pay plaintiff 10% annual interest on all funds held by defendant for plaintiff from the date plaintiff directs a sale to the date of his reemployment. As to the shares for which defendant must pay plaintiff the September 6, 1983 market price, interest must be paid from the date of this order.

Of course, if plaintiff is not reemployed pursuant to the statute, he will be entitled to no more than the return of the purchase price he has already paid for the stock, and any future payments he makes pursuant to this ruling.

Plaintiff has also moved to amend his complaint to include a claim of anticipatory breach of contract, and has moved for summary judgment on that claim. Since, however, plaintiff has been granted relief under the equitable power of this court, it is unnecessary to consider the anticipatory breach claim.

*Conclusion*

Plaintiff's motion for summary judgment is granted in part in that: (1) defendant will be directed to carry plaintiff on a military leave of absence from May 28, 1982 until May 28, 1986; and (2) defendant is directed to hold for plaintiff shares of stock and proceeds from the sale of stock in accordance with this opinion. Plaintiff's motion for leave to file an amended complaint is denied. Defendant's motion for summary judgment is denied.

Counsel for plaintiff is requested to submit a form of order implementing this opinion.