In the

# United States Court of Appeals

### For the Seventh Circuit

No. 14-1970

ROBERT D. DELEE,

*Plaintiff-Appellant,*

*v.*

CITY OF PLYMOUTH, INDIANA,

*Defendant-Appellee.*

Appeal from the United States District Court for the
Northern District of Indiana,
No. 3:12-cv-380 — **James T. Moody**, *Judge.*

ARGUED OCTOBER 2, 2014 — DECIDED DECEMBER 9, 2014

Before FLAUM, MANION, and HAMILTON, *Circuit Judges.*

FLAUM, *Circuit Judge.* Pursuant to a long-standing local ordinance, the City of Plymouth, Indiana pays its police officers "longevity pay" after each work anniversary, calculated by multiplying $225 by the number of years that the officer has been on the force. Faced with financial difficulties in 1989, Plymouth enacted a second longevity pay ordinance pertaining to police, which prorates longevity pay for officers who take a leave of absence during

any given year, including for military service. During po-
lice officer Robert DeLee's twelfth year on the job, he
missed nearly eight months of work while serving in the
United States Air Force Reserves. And so, when he re-
turned, Plymouth paid him one-third of his full longevity
payment for that year. DeLee sued, arguing that longevi-
ty pay is a seniority-based benefit to which the Uni-
formed Services Employment and Reemployment Rights
Act ("USERRA"), 38 U.S.C. §§ 4301–4335, entitles him in
full. Because we conclude that Plymouth's longevity ben-
efit is more appropriately characterized as a reward for
lengthy service, rather than as compensation for work
performed the preceding year, USERRA guarantees
DeLee a full longevity payment for his twelfth year of
employment. Accordingly, we reverse the district court's
grant of summary judgment in favor of Plymouth.

## I. Background

In addition to salary, the City of Plymouth, Indiana
pays its long-serving police officers and firefighters (to-
gether, "emergency personnel") what Plymouth calls
"longevity pay" on the anniversaries of their start dates.
Prescribed by city ordinance, longevity pay is "additional
compensation" to be paid to qualified emergency per-
sonnel who have "at least three years of continuous ser-
vice to the City." *See* Plymouth, Ind., Ordinance Nos.
2009–1987 (Aug. 10, 2009), 2010–2009 (Aug. 23, 2010). The
portion of the ordinance pertaining to police officers
states:

> Longevity pay is calculated to be $225.00.
> The amount to be paid to a qualified police
> officer is $225.00 multiplied by the number

of years of continuous service. The maxi-
mum amount paid shall be $4,500.00. Lon-
gevity shall be paid on the pay day follow-
ing the anniversary date of employment for
that individual.

*Id.*

The record does not indicate when the longevity pay
ordinance for emergency personnel was first enacted, but
the parties suggest that it was long before 1989. That is a
relevant fact, because 1989 is the year in which Plymouth
enacted Ordinance No. 1480, which reads:

WHEREAS, longevity pay has long been
recognized as an incentive for police and
firemen to remain in the service of the City;
and,

WHEREAS, a question has arisen con-
cerning the advisability of paying longevity
to members of the police department or fire
department who have gone to an inactive
status by reason of a leave of absence, or
who have been assigned to duties other
than the normal, customary duties of the
fire department or police department; and,

WHEREAS, in the interest of fiscal re-
sponsibility and fairness, it should be rec-
ognized that a member of the police de-
partment or fire department who is in an
inactive status, but who has reached an an-
niversary date for purposes of longevity
pay, should be paid said longevity, but as

calculated on the number of months of active service to the City in the respective departments.

NOW, THEREFORE, BE IT ORDAINED

* * * * *

Longevity pay shall be prorated for any qualified policeman or policewoman who during the year immediately preceding their anniversary date is on a leave of absence, or who is otherwise not engaged in the active performance of the normal and customary duty of the police department. Longevity shall be prorated based on the number of months of actual active duty during the year immediately preceding the anniversary date.

Plymouth, Ind., Ordinance No. 1480 (Nov. 13, 1989).

Robert DeLee is a patrolman in Plymouth, Indiana, who has been with the Plymouth police since April 19, 1999. On his eleventh anniversary, DeLee received longevity pay in the amount of $2,475 ($225 times 11 years). In his twelfth year on the job, DeLee was called to active service by the United States Air Force, in which he has served as a member of the Reserves since July 7, 1997 and currently holds the rank of Technical Sergeant. DeLee was mobilized for active duty on September 1, 2010 and returned to his job as a Plymouth patrolman on May 11, 2011. Upon his return, Plymouth paid him his longevity pay for that year, prorated pursuant to Ordinance No. 1480 for the time that he had spent serving in the Air

Force. Had DeLee been actively employed as a patrolman for the entire year, he would have earned a longevity payment of $2,700 ($225 times 12 years). Instead, because DeLee had worked approximately four months of his individual fiscal year, Plymouth issued him one-third of a full longevity payment—or $900.

Believing that Plymouth violated federal law by withholding $1,800 of his longevity pay, DeLee filed a USERRA complaint with the Veterans' Employment Service of the Department of Labor. DOL investigated and, after an unsuccessful attempt to resolve the issue with Plymouth, referred the matter to the Department of Justice, which agreed to represent DeLee in litigation.

DeLee then sued Plymouth in the Northern District of Indiana for alleged violations of USERRA. DeLee's complaint accuses Plymouth of violating 38 U.S.C. § 4316(a) by denying him full longevity pay, which he alleges is a seniority-based benefit to which USERRA entitles him. Without taking discovery, the parties filed cross-motions for summary judgment on the § 4316(a) claim.[1] The district court granted Plymouth's motion for summary judgment and denied DeLee's motion for partial summary judgment. DeLee appealed, and so we review the district court's ruling on the parties' cross-motions for summary judgment de novo. *Gross v. PPG Indus., Inc.*, 636

---

[1] DeLee also sought statutory damages for a willful USERRA violation pursuant to 38 U.S.C. § 4323(d)(1)(C). A plaintiff is entitled to a jury trial on a liquidated damages claim under USERRA, *Middleton v. City of Chicago*, 578 F.3d 655, 659 (7th Cir. 2009), and DeLee did not move for summary judgment on that claim. Plymouth, however, moved for summary judgment on both counts.

F.3d 884, 888 (7th Cir. 2011); *Storie v. Randy's Auto Sales, LLC*, 589 F.3d 873, 876 (7th Cir. 2009).

## II. Discussion

USERRA, the most recent statute in a long line of federal veterans' rights laws enacted since the Selective Training and Service Act of 1940, was passed in 1994 to strengthen existing employment rights of veterans of our armed forces.[2] *Gross*, 636 F.3d at 888. The statute seeks (1) to encourage military service by minimizing the disadvantages to civilian careers, (2) to minimize the disruption in the lives of servicemembers by providing prompt reemployment, and (3) to prohibit servicemember discrimination. 38 U.S.C. § 4301(a). USERRA accomplishes these goals by prohibiting an employer from discriminating against a servicemember because of his service (§ 4311), requiring prompt reemployment of a returning servicemember (§§ 4312, 4313(a)), establishing a protective period during which an employer may not discharge a reemployed servicemember without cause (§ 4316(c)), and—relevant to this case—affording returning servicemembers all of the seniority and seniority-based benefits that they would have attained had they remained continuously employed (§ 4316(a)).

More precisely, § 4316(a) specifies:

---

[2] "Congress emphasized when enacting USERRA that to the extent it is consistent with USERRA, the 'large body of case law that had developed' under the predecessor statutes to USERRA 'remained in full force and effect.'" *Gross*, 636 F.3d at 888 (quoting 20 C.F.R. § 1002.2).

> A person who is reemployed under this chapter is entitled to the seniority and other rights and benefits determined by seniority that the person had on the date of the commencement of service in the uniformed services plus the additional seniority and rights and benefits that such person would have attained if the person had remained continuously employed.

38 U.S.C. § 4316(a).

USERRA defines "benefits" and "rights and benefits" to mean:

> any advantage, profit, privilege, gain, status, account, or interest (including wages or salary for work performed) that accrues by reason of an employment contract or agreement or an employer policy, plan, or practice and includes rights and benefits under a pension plan, a health plan, an employee stock ownership plan, insurance coverage and awards, bonuses, severance pay, supplemental unemployment benefits, vacations, and the opportunity to select work hours or location of employment.

38 U.S.C. § 4303(2). USERRA defines "seniority" as "longevity in employment together with any benefits of employment which accrue with, or are determined by, longevity employment." 38 U.S.C. § 4303(12).

In other words, USERRA requires employers to adhere to the "escalator" principle, placing a returning ser-

vicemember at the "precise point he would have occupied had he kept his position continuously" while away from the job for his military service. *Fishgold v. Sullivan Drydock Corp.*, 328 U.S. 275, 284–85 (1946) (interpreting the Selective Training and Service Act of 1940's seniority provision); *Rogers v. City of San Antonio*, 392 F.3d 758, 763 (5th Cir. 2004) (quoting *Fishgold* in the USERRA context). Of importance here, USERRA "supersedes any State law (including local law or ordinance), contract, agreement, policy, plan, practice, or other matter that reduces, limits, or eliminates in any manner any right or benefit provided by" USERRA. 38 U.S.C. § 4302(b).

At summary judgment, the district court focused on the language of Plymouth's proration ordinance—mindful of the guidance promulgated by the Supreme Court in *Accardi v. Pennsylvania R.R. Co.*, 383 U.S. 225 (1966), and *Foster v. Dravo Corp.*, 420 U.S. 92 (1975)—in arriving at its conclusion that Plymouth's longevity pay for police officers is not a benefit determined by seniority. *Accardi* involved returning servicemembers' claims to severance payments, which the Supreme Court determined to be a seniority-based benefit to which the servicemembers were entitled. 383 U.S. at 232. Following honorable discharges from the armed forces, Accardi and his co-plaintiffs returned to their jobs at the Pennsylvania Railroad and were restored to their former positions with the same amount of seniority that they had when they left, plus credit for the three years they had spent in the armed forces. *Id.* at 227. Fifteen years later, however, the men were laid off and, pursuant to their union agreement, awarded severance pay based on "the length of compensated service" with the railroad. *Id.* at 227–28. The

railroad excluded the three years that the men had spent in the armed forces. The men sued, alleging violations of the Selective Training and Service Act of 1940, which required employers to reinstate honorably discharged employees to "their former position" or "a position of like seniority, status, and pay," without a loss of seniority. *Id.* at 229.

The statute's purpose, the Supreme Court said, was "to preserve for the returning veterans the rights and benefits which would have automatically accrued to them had they remained in private employment rather than responding to the call of their country." *Id.* at 229–230. Although the severance payments were based primarily on the employees' length of service with the railroad, the railroad argued that severance was "not based on seniority, but on the actual total service rendered by the employee." *Id.* at 230. The Supreme Court rejected that argument for two reasons. First, the Court noted, the railroad's rules afforded severance credit for an entire year to an employee who had worked just seven days, undercutting the railroad's argument that the severance payments were compensation for services rendered. *Id.* Next, the Court said, "the real nature" of severance payments are compensation for loss of a job, not payment for services rendered. *Id.* For those reasons, the Supreme Court concluded that severance payments are "a means of compensating employees for the loss of rights and benefits accumulated over a long period of service"—not, as the railroad had argued, a form of deferred compensation for work done in the past. *Foster*, 420 U.S. at 98 (describing the holding in *Accardi*). Accordingly, the sever-

ance payments were a seniority-based benefit guaranteed by federal statute, the Court held. *Id.*; 383 U.S. at 232.

By contrast, *Foster* involved the accrual of vacation benefits, which the Supreme Court deemed a form of short-term compensation for work performed, and thus not a benefit based on an employee's seniority to which a servicemember was entitled pursuant to the Military Selective Service Act. 420 U.S. at 100. Foster's union's collective bargaining agreement required employees to work twenty-five weeks in a calendar year to accrue the company's full amount of allotted vacation time. *Id.* at 94. Foster worked seven weeks in 1967, took military leave, and then returned for thirteen weeks in 1968. *Id.* When his employer denied him vacation days for both years, he sued, arguing that vacation days are a seniority-based benefit. The Supreme Court disagreed, highlighting the difference between the vacation benefits at issue and the severance payments addressed in *Accardi*. Both included a work requirement, but unlike the work requirement in *Accardi* (which "appear[ed] plainly designed to measure time on the payroll rather than hours on the job"), the work requirement to accrue vacation benefits "constitute[d] a bona fide effort to compensate for work actually performed." *Id.* at 99. Critical to the Court's conclusion that "vacation benefits were [not] intended to accrue automatically as a function of continued association with the company" was the fact that employees accrued extra vacation time as they worked overtime hours, and that if an employee was laid off before hitting the 25-week mark, he was compensated for vacation days on a pro rata basis. *Id*. at 100-01. Thus, the Court held, the vacation benefits at issue were more appropriately characterized

as "a form of shortterm compensation for work performed." *Id.* at 100.

The district court considered the circumstances and reasoning of these two cases and concluded that Plymouth's longevity pay for police officers is more akin to a vacation benefit than to a severance payment because of the operation of Ordinance No. 1480, which, as discussed, serves to prorate the benefit according to the months that an employee was on a leave of absence. The district court concluded that the longevity *rate* (*i.e.,* the number of years of employment by which $225 is multiplied) "is plainly a seniority benefit," but that the longevity *amount* "is clearly intended to be compensation for work actually performed in the preceding year." *DeLee v. City of Plymouth, Ind.*, 2014 WL 1316870, at *4 (N.D. Ind. Mar. 31, 2014). Therefore, in the district court's view, DeLee was not deprived of the seniority benefit—the $225 was multiplied by 12, even though his total longevity payment then was prorated—and Plymouth did not run afoul of USERRA. *Id.*

There is logic to the district court's reasoning: by prorating longevity pay, the benefit appears to be more closely tied to the number of months an employee has worked in the short term than to the number of years that he has been employed by the City. And the result seems equitable because it provides DeLee *some* seniority benefit (in the form of the rate calculation) for his missed time, without requiring the City to provide him a full longevity payment for a year in which he took a leave of absence. But a pair of more recent Supreme Court cases—*Alabama Power Co. v. Davis*, 431 U.S. 581 (1977), and *Coffy*

*v. Republic Steel Corp.*, 447 U.S. 191 (1980)—compel a conclusion contrary to the one reached by the district court.

In *Alabama Power*, a reemployed servicemember sued his employer pursuant to the Military Selective Service Act, after he was denied employer pension credit for the time he had spent on military leave. 431 U.S. at 582. Again the Supreme Court stressed the importance of identifying the "real nature" of the payments, noting that, in *Accardi*, the Court had rejected an employer's attempt to "disguise" severance payments by "use of a 'compensated service' formula to calculate the amount of payments." *Id.* at 588. And the Court reiterated *Foster*'s conclusion that vacation benefits were "a form of pay for work done" largely on account of the "common conception of a vacation as a reward for and respite from a lengthy period of labor." *Id.* at 589.

The Court stressed that there are "two axes of analysis" for determining whether a benefit is a right of seniority secured by a veteran: (1) whether the benefit would have accrued, with reasonable certainty, if the veteran had been continuously employed during his military service, and (2) whether the benefit is a "perquisite of seniority." *Id.* Prong one was easily satisfied, the Court held. *Id.* at 591. In analyzing prong two—and this is particularly instructive in DeLee's case—the Court emphasized that *Foster* "turned on the nature of vacation benefits, not on the particular formula by which those benefits were calculated"—"[e]ven the most traditional kinds of seniority privileges could be as easily tied to a work requirement as to the more usual criterion of time as an

employee," the Court said. *Id.* at 592. Against that back-drop, the Court noted:

> It is obvious that pension payments have some resemblance to compensation for work performed. Funding a pension pro-gram is a current cost of employing poten-tial pension recipients, as are wages . . . . The same observations, however, can be made about any benefit and therefore are of little assistance in determining whether a particular benefit recompenses labor or re-wards longevity with an employer.

*Id.* at 592–93. Taking into account all of the different as-pects of pension plans, the Court concluded that the "'true nature' of the pension payment is a reward for length of service." *Id.* at 593. To the Court, the "most sig-nificant factor pointing to this conclusion [was] the lengthy period required for pension rights to vest in the employee." *Id.* at 593. But the Court also was swayed by the "function of pension plans in the employment sys-tem"—"[by] rewarding lengthy service, a plan may re-duce employee turnover and training costs and help an employer secure the benefits of a stable work force." *Id.* at 594. These same objectives are accomplished by Plym-outh's longevity payments, as even the preamble of Or-dinance No. 1480 acknowledges.[3]

---

[3] Plymouth devotes a sizable portion of its brief to an analysis of *Jackson v. Beech Aircraft Corp.*, 517 F.2d 1322 (10th Cir. 1975), which Plymouth believes to be the only circuit court decision addressing longevity pay under USERRA or a predecessor statute. Although the court found the "longevity pay" at issue in that case not to be senior-

The ordinance's preamble—which speaks to the ordinance's purpose and therefore aids us in assessing the fundamental nature of Plymouth's longevity benefit—tells us several things. First, by noting that "longevity pay has long been recognized as an incentive for police and firemen to remain in the service of the City," the ordinance acknowledges the benefit's history as a reward for lengthy service. (Indeed, Plymouth concedes that longevity pay, in the absence of proration, is a seniority-based benefit.) Second, by flagging the advent of "questions . . . concerning the advisability of paying longevity" to those on inactive status, the ordinance highlights the potential unsustainability of that policy. Finally, by announcing that it was informed by considerations of "fiscal responsibility and fairness," the ordinance self-identifies as a compromise that remains true to Plymouth's long-standing tradition of paying firefighters and police a longevity payment, while accounting for the financial realities of the day. The plain language of the

---

ity-based, *Jackson* is of little utility. Plymouth overlooks that the Supreme Court specifically granted certiorari in *Alabama Power* because of a conflict among the circuits, and that *Alabama Power*'s holding (that pension benefits are seniority-based) overruled the holding in *Jackson* (that they are not). That result renders questionable the continuing force of *Jackson*'s ruling concerning longevity pay. Moreover, the "longevity pay" in *Jackson* was fundamentally different from the one at issue here. In *Jackson*, longevity pay took the form of "an hourly premium of 5 cents per hour" after five years and "10 cents per hour" after ten years on the job. *Id.* at 1323. The benefit in *Jackson*, therefore, was more akin to a raise, than to the "longevity pay" that Plymouth provides.

preamble, therefore, strongly suggests that by enacting its proration policy, Plymouth sought to cut the cost of paying an expensive benefit, without disturbing its underlying purpose. The Supreme Court's decision in *Coffy* underscores the importance of the ordinance's origins in our diagnosis of its true nature.

In *Coffy*, the Court deemed supplemental unemployment benefits ("SUBs") to be a seniority-based benefit, the denial of which violated the plaintiff's rights under the Vietnam Era Veterans' Readjustment Assistance Act of 1974. 447 U.S. at 193. As in *Alabama Power*, the Court found the reasonable certainty prong of the two-axes test to be easily satisfied (SUBs are a benefit that would have accumulated had Coffy not taken a leave of absence to perform military service), and so the Court focused on ascertaining the "real nature" of the benefit. *Id.* at 199–200. In doing so, the Court traced the history of SUBs, which evolved from the demand by organized labor for a guaranteed annual wage. *Id.* at 200. As the Court explained, once it became evident to unions in certain industries that their fight for a guaranteed minimum wage was a losing battle, they switched their focus to supplementing existing unemployment compensation programs. *Id.* "From the beginning, then, the purpose of SUB plans was to provide employment security regardless of the hours worked rather than to afford additional compensation for work actually performed. From the employer's standpoint, SUBs, like pension benefits, help to assure a stable work force through periods of short-term layoffs." *Id.* Moreover, the "essential function of SUB plans is to provide economic security for regular employees in the event they are laid off. Protection against

layoff is, of course, one of the traditional attributes of seniority." *Id.*

In its appellate brief, Plymouth explains the historical context in which it enacted its proration policy, explaining that its adoption was precipitated by the Supreme Court's ruling in *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985). By Plymouth's characterization, *Garcia* "affirmed the constitutionality of Congress' extension of the [Fair Labor Standards Act] to local governments" and "struck a major financial blow to municipalities." The resultant financial stress prompted Plymouth—"in the interest of fiscal responsibility and fairness"—to adopt the longevity pay proration policy set forth in Ordinance No. 1480. This is insightful, because it demonstrates that Plymouth began prorating longevity pay—tying it for the first time to a work requirement—to save money, not because it no longer sought to reward longevity and incentivize continued employment for its firefighters and policemen.

Besides the historical context in which SUBs came about, three elements of the SUB plan influenced the *Coffy* Court's decision, all of which cut convincingly in DeLee's favor with regard to characterizing longevity pay as a seniority-based benefit. First, the Supreme Court rejected the district court's conclusion that SUB payments were so closely related to hours worked as to demonstrate that the plan was a "bona fide effort to compensate for work actually performed," since that conclusion "is at odds with the literal terms of the plan, which provide that SUB credits are earned for all weeks in which an employee has *any* hours." 447 U.S. at 201 (emphasis in

original). Like Coffy's employer, Plymouth claims that the contested benefit is compensation for work performed, but the literal terms of the benefit do not support that conclusion. Recall that DeLee's anniversary date is April 19 and that DeLee deployed from September 1, 2010 until May 11, 2011. DeLee therefore missed 7 months and 19 days of his twelfth year on the job and another 23 days in his thirteenth year. Yet Ordinance No. 1480 calls for proration "based on the number of months of actual active duty," and so when Plymouth calculated his prorated benefit, it discounted his longevity pay by 8/12. The rough estimation used by Plymouth suggests the same thing that Ordinance No. 1480's preamble implies—that Plymouth prorates the longevity payments as a cost-savings mechanism pursuant to a fiscal compromise, not because the longevity pay is payment for days in which work was *actually* performed.

Second, the Supreme Court took into consideration the fact that an employee earned SUB credits for time that the employee did not actually work, such as while attending jury duty, out disabled, or performing certain union duties. *Id.* at 202. For that reason, the Court rejected the employer's argument that the 32-hour work-week minimum revealed the SUB plan's nature as deferred compensation for work performed. *Id.* The Court also highlighted that Coffy's SUB plan made no provision for accrual of additional credits for hours worked over 32 per week or for overtime. "This omission is not suggestive of a desire to compensate work actually performed," the Court reasoned. *Id.* at 202. Similarly, Plymouth issues full longevity pay, without proration, to employees who missed significant time from work (for jury duty, vaca-

tion, sick time, etc.), as long as the employee was not out on an official leave of absence. Moreover, Plymouth does not award employees any extra longevity pay for overtime.

Finally, the *Coffy* Court took note of the fact that employees received no benefits if they were laid off or quit before having worked for the company for two years. *Id.* at 205. "Such a threshold requirement is more characteristic of seniority provisions than of compensation." *Id.* Likewise, for a Plymouth police officer to earn a longevity payment, he must have been with the City continuously for three years.

Applying the *Alabama Power* test to DeLee's situation, there is no question that a full longevity payment would have accrued but for his leave of absence. And, as described above, every meaningful aspect of the "perquisites of seniority" considered by the Supreme Court in *Alabama Power* and *Coffy* cuts decisively in DeLee's favor. Nevertheless, Plymouth maintains that its longevity benefit is compensation for work done during the prior year, staking its position on the "simple idea that wages are earned through work." But longevity payments are not wages. And, in any event, that "simple idea" contravenes USERRA's guarantee of seniority benefits, which include seniority-based bonuses. *See* 38 U.S.C. § 4303(2).[4] In *Coffy*,

---

[4] Plymouth points to *Featsent v. City of Youngstown*, 70 F.3d 900 (6th Cir. 1995), in support of the proposition that longevity pay should not be considered a reward for lengthy service under USERRA. *Featsent* is an FLSA case, in which the plaintiffs, city police officers, challenged the city's compliance with the overtime requirements of the statute. The FLSA requires that employers compensate their em-

the Supreme Court emphasized that "[e]ven if eligibility for SUB payments were closely related to hours worked, that fact would not, by itself, render them compensation rather than seniority rights." 447 U.S. at 203. That is because the nature of the benefit, not the formula by which it is calculated, is the "crucial factor, 'for even the most traditional kinds of seniority privileges could be as easily tied to a work requirement as to the more usual criterion of time as an employee.'" *Id.* at 204 (quoting *Alabama Power*, 431 U.S. at 592). Ultimately, the history of SUB plans, as well as the plan's specific provisions, compelled the *Coffy* Court's conclusion that the benefit was a reward for lengthy service. *Id.* These same considerations dictate the outcome here, where we conclude that the original purpose of Plymouth's longevity pay for police was to reward them for lengthy service and that that purpose survived the subsequently-enacted proration ordinance. Accordingly, the "real nature" of longevity pay forecloses the City's argument that its prorated payments to po-

---

ployees who work in excess of forty hours per week at a rate one-and-a-half times the regular rate at which they are employed. *Id.* at 903. Among other things, the *Featsent* plaintiffs argued that the city failed to incorporate longevity pay into the calculation of its "regular hourly rate," which the statute defines to include "all remuneration for employment paid to, or on behalf of, the employee." *Id.* at 904. In light of the statute's requirement that the "regular rate" include *all* remuneration for employment, the Sixth Circuit held that longevity pay must be included in the calculation, even though "by definition" longevity pay is "*payment[] given on the basis of length of service*" "*to compensate police officers for their service to the city*." *Id.* 905–06 (emphases added). If anything, therefore, this case undermines, rather than supports, Plymouth's argument.

lice officers are compensation for work actually performed that year.

### III. Conclusion

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.